REGINA A. POCZATEK, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4438–72.     Filed December 13, 1978.

---

*Daniel D. Levenson* and *Jonathan J. Margolis,* for the petitioner.

*Edward DeFranceschi,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income tax as follows:

| Year | Deficiency | Addition to tax sec. 6651(a)[1] |
|------|-----------|-------------------------------|
| 1965 ......... | $120.00 | --- |
| 1966........... | 141.81 | $141.53 |
| 1967........... | 460.24 | --- |
| 1968........... | 3,168.20 | --- |

Due to concessions, the only issue for our decision is whether Regina A. Poczatek is taxable on the gain resulting from the sale of her stock during 1968 by United States Trust Co. when the proceeds of the sale were applied against a loan made by petitioner.

### FINDINGS OF FACT

Some of the facts have been stipulated and together with the exhibits attached thereto are incorporated by this reference.

Mrs. Regina A. Poczatek, herein petitioner, resided at Chelsea, Mass., when she filed her petition in the instant case. She filed

---

[1]All section references are to the Internal Revenue Code of 1954, as amended.

her individual Federal income tax returns for the taxable years 1965, 1966, 1967, and 1968 with the District Director of Internal Revenue at Boston, Mass., after she discovered that her husband, Mr. Albert Poczatek, deceased, failed to file joint Federal income tax returns for those years. She and her husband were married during the taxable year 1965 and remained married until his death in 1969.

On July 13, 1965, petitioner, at the request of her husband, executed a short term note in the amount of $18,500 to the United States Trust Co., herein the bank, which was due on November 15, 1965. The loan was secured by collateral of her 400 shares of Goodyear Tire & Rubber Co. stock and 200 shares of Bethlehem Steel Corp. stock. In addition, petitioner executed irrevocable stock powers with respect to the pledged stock. Petitioner had received the Goodyear stock by gift from her father in May 1958.

Petitioner received the net proceeds of the loan ($18,146.70) from the bank in the form of two checks, both payable to her for $500 and $17,646.70. Petitioner deposited the check in the amount of $500 in a joint checking account she and her husband established with the bank. She endorsed the second check to her husband who used the money to purchase a building from his father who conveyed it to petitioner's husband. Petitioner's husband subsequently sold the building but the record does not indicate what happened to the proceeds from the sale.

When the note became due on November 15, 1965, petitioner's husband renewed the loan for another 4-month period by forging petitioner's signature to the renewal note. From March 15, 1966, to December 19, 1968, petitioner's husband renewed the loan on 12 separate occasions, each time forging petitioner's signature to the renewal notes. During July 1966 he added his own name as comaker and in May 1967 increased the amount of the loan to $25,000.

On December 16, 1968, the bank sold 300 shares of petitioner's Goodyear stock, which had a basis to petitioner of $265, pursuant to a sell order executed by petitioner's husband by forging petitioner's signature. The bank applied the proceeds from the sale ($17,587.26) to the loan. Following this transaction, petitioner's husband borrowed additional amounts of $11,000 and $5,000 on December 17, 1968, and December 19, 1968, respectively, by executing notes in his own name and forging petitioner's

signature. The remaining stock pledged by petitioner as collateral for the original note was pledged as collateral for the renewal notes.

Petitioner was not familiar with her husband's business affairs but she presumed that on November 15, 1965, when the original note was due, her pledged stock was released by the bank and placed in her safety deposit box. She received dividends on her Goodyear stock until part of it was sold and never suspected that her husband was forging her signature on notes and pledging her stock.

Petitioner never authorized her husband to sign her name to any note to renew the note she executed on July 13, 1965. In addition, petitioner never authorized the bank or her husband to sell the 300 shares of Goodyear stock sold by the bank in 1968.

Petitioner filed suit against the bank alleging that she was not legally indebted to the bank and that the bank wrongfully converted her Goodyear stock. The bank answered petitioner's allegations by pleading an offset, claiming that petitioner owed the bank $23,412.74 plus interest from March 17, 1969. Presumably this amount represented the unpaid balance of loans made to petitioner's husband in December 1968. On January 10, 1974, we entered an order postponing our decision until the final disposition of petitioner's lawsuit which was pending before the Superior Court of Suffolk County, Commonwealth of Massachusetts. Subsequent to our order, the parties settled the lawsuit and the bank agreed to pay $17,500 to petitioner for conversion of her stock. An agreed judgment was entered on June 8, 1978, with the Superior Court of Suffolk County.

The Commissioner, in his statutory notice of deficiency, determined that petitioner realized a net long-term capital gain in the amount of $17,737 from the sale of her 300 shares of Goodyear stock. Petitioner did not report this gain on her Federal income tax return for the taxable year 1968.

## OPINION

The sole issue for our decision is whether petitioner is taxable on the gain realized from the sale of her stock in 1968 by the bank when the proceeds of the sale were applied against a loan made by petitioner but extended by her husband without her knowledge. In 1965, petitioner executed a note in the amount of $18,500 to the United States Trust Co. which was due on

November 15, 1965. She pledged corporate stock to the bank as collateral for the loan which included 400 shares of Goodyear Tire & Rubber Co. Petitioner also executed stock powers covering the pledged stock. The bank paid the net proceeds of the loan in two checks payable to petitioner for $500 and $17,646.70. Petitioner deposited the check for $500 in a checking account which was held jointly with her husband and endorsed the second check ($17,646.70) to her husband who used the funds to purchase a building from his father. When the note became due, petitioner's husband forged petitioner's signature to a renewal note without her knowledge or permission. When the renewal note became due, petitioner's husband continued to renew the note as he had done in November 1965. In July 1966, he added his name to the renewal note as comaker and in May 1967 he increased the amount of the loan from $18,500 to $25,000. On December 6, 1968, petitioner's husband forged petitioner's signature on a sell order which authorized the bank to sell 300 shares of Goodyear stock. The bank sold the stock and applied the proceeds from the sale ($17,587.26) to the loan. Following this transaction, petitioner's husband borrowed additional amounts of $11,000 and $5,000 from the bank on December 17, 1968, and December 19, 1968, by executing new notes in his name and by forging petitioner's signature. The remaining stock originally pledged by petitioner remained in possession of the bank as collateral for the new notes.

Petitioner neither authorized her husband to renew the note she executed nor authorized him to pledge her securities for new notes executed by him. In addition, she never authorized her husband or the bank to sell her Goodyear stock in 1968.

After discovering her husband's past activities and the actions taken by the bank, petitioner filed a lawsuit against the bank alleging that she was not legally indebted to the bank and that the bank wrongfully sold her stock in 1968. The bank answered by pleading an offset and alleging that petitioner owed the bank $23,412.74 plus interest running from March 17, 1969. Presumably this amount represented the money borrowed by petitioner's husband during December 1968. On June 8, 1978, petitioner and the bank settled the lawsuit and an agreed judgment was entered whereby the bank agreed to pay $17,500 to petitioner for conversation of her Goodyear stock. In addition, the bank agreed

to sell the remaining stock it held pursuant to the notes executed by petitioner's husband.

Petitioner takes the position that she is not taxable on the gain realized from the sale of her stock until the transaction relating to the gain becomes closed, which is 1978. Petitioner argues that no tax may be imposed during the pendency of her litigation against the bank which involves the transaction which respondent seeks to tax.

Respondent contends that the bank's sale of petitioner's stock is tantamount to a forced sale and, therefore, subject to the provisions of sections 1001 and 1002, irrespective of the absence of petitioner's authorization to sell. Respondent points out that the bank came into rightful possession of the stock when petitioner executed the original note and the bank applied the proceeds from the sale against the note for which petitioner was liable. For these reasons respondent contends that petitioner is taxable in the year the proceeds were applied against the loan; i.e., the taxable year 1968. Respondent recognizes that a different result might have occurred had the bank misappropriated the sale proceeds to its own use and benefit rather than applying it against petitioner's liability.

Accordingly, the parties agree that the crucial question to be resolved is whether petitioner was legally indebted to the bank on the renewal note at the time her stock was sold.

Petitioner, relying on *Farrell v. Commissioner*, 134 F.2d 193 (5th Cir. 1943), contends that she never received the proceeds from the sale of her stock and because the proceeds are the subject of the litigation in the State court of Massachusetts, no income must be recognized until the final disposition of that case. Because the parties settled the lawsuit, the Massachusetts court did not speak to the issue of petitioner's liability on the renewal note. Therefore, we must decide the applicability of Massachusetts law to petitioner's indebtedness to the bank. *Meredith v. City of Winter Haven*, 320 U.S. 228 (1943).

It is well settled that income is taxable when it has been actually or constructively received. *North American Oil Consolidated Co. v. Burnet*, 286 U.S. 417 (1932). Accordingly, no tax is due on income that has not been and may never be received. *Burnet v. Logan*, 283 U.S. 404 (1931). However, it is equally well settled that income is not limited to direct receipt of cash *(Crane v. Commissioner*, 331 U.S. 1 (1947)), and payment of a legal

obligation of a taxpayer is income to him even though such income is not actually received by him. *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929); *Amos v. Commissioner*, 47 T.C. 65 (1966); *Tucker v. Commissioner*, 69 T.C. 675 (1978).

Respondent relies upon *Citizens Fidelity Bank & Trust Co. v. Stark*, 431 S.W.2d 722 (Ky. Ct. App. 1968). In that case, four individuals were legally indebted to three separate banks. One of the individuals contacted a fourth bank which paid the three existing loans by a loan in which he forged the names of the other three individuals to the new note. The fourth bank, upon payment of the loans, obtained the notes from two of the three banks, marked them paid and delivered them to the forger, retaining the collateral originally pledged. The court, in applying Kentucky's Uniform Commercial Code, held that the three individuals were legally indebted to the original bank and, therefore, legally indebted to the fourth bank irrespective of the fact that their names had been forged to the new note. In so holding the court stated:

> It is our opinion that the action of * * * [the fourth bank] in surrendering the original notes to * * * [the forger] after having permitted them to be marked "Paid" by * * * [the two original banks] did not operate to discharge the indebtedness of * * * [the other three individuals] nor to release the collateral that had been pledged to secure the indebtedness. This is so because the cancellation and surrender of the original notes were the result of fraud. [431 S.W.2d at 724.]

Respondent has not cited any Massachusetts decision but in *Clark v. Young*, 231 Mass. 156 (1918), 120 N.E. 397 (1918), and cited cases therein, the Supreme Judicial Court held that forged renewal notes did not operate as payment of the original valid note or discharge the maker. Correspondingly, the court held that the original maker of the note was indebted to a bank whether the renewal notes were forged or genuine. While this decision predates the adoption of the Uniform Commercial Code by Massachusetts, it is consistent with its version of the code which specifically sets forth events which discharge a maker of a note, as follows:

> Section 3–601. Discharge of Parties
> (1) The extent of the discharge of any party from liability on an instrument is governed by the sections on
>    (a) payment or satisfaction (section 3–603); or
>    (b) tender of payment (section 3–604); or
>    (c) cancellation or renunciation (section 3–605); or

(d) impairment of right of recourse or of collateral (section 3–606); or

(e) reacquisition of the instrument by a prior party (section 3–208); or

(f) fraudulent and material alteration (section 3–407); or

(g) certification of a check (section 3–411); or

(h) acceptance varying a draft (section 3–412); or

(i) unexcused delay in presentment or notice of dishonor or protest (section 3–502).

(2) Any party is also discharged from his liability on an instrument to another party by any other act or agreement with such party which would discharge his simple contract for the payment of money.

(3) The liability of all parties is discharged when any party who has himself no right of action or recourse on the instrument

(a) reacquires the instrument in his own right; or

(b) is discharged under any provision of this Article, except as otherwise provided with respect to discharge for impairment of recourse or of collateral (section 3–606). [Mass. Gen. Laws Ann. ch. 106, sec. 3–601 (West).]

For these reasons we find that under Massachusetts law the renewal of the original note did not operate as a discharge of petitioner's liability, irrespective of the fact that petitioner's husband was not authorized to sign her name to the renewal notes. She remained legally indebted to the bank on the original note. Accordingly, when the bank applied the proceeds from the sale of petitioner's stock to her debt originally incurred in 1965, petitioner realized a gain from the sale. This is so even though petitioner did not actually receive the proceeds nor have the power to exercise control over such proceeds. While the bank may have improperly sold petitioner's stock, the fact remains that petitioner was relieved of a legal obligation which existed at the time the bank applied the proceeds against her indebtedness. Therefore, petitioner is taxable on the gain from the sale of her securities in the taxable year 1968. Our finding that petitioner was legally indebted to the bank at the time the proceeds were used to satisfy her debt vitiates petitioner's argument that the gain from the sale must be postponed for purposes of recognition until the lawsuit between the bank and her is finally resolved. Cf., e.g., *Farrell v. Commissioner, supra; North American Oil Consolidated Co. v. Burnet, supra.* The application of the proceeds to her loan in 1968 provided an immediate benefit to petitioner which constituted income in the taxable year 1968. *Amos v. Commissioner, supra.*

*Decision will be entered under Rule 155.*