ARTHUR JOEL EISENBERG AND JUNE A. EISENBERG, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 828–79.    Filed March 3, 1982.

*George Constable*, for the petitioners.
*Thomas N. Tomashek*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined deficiencies in the amounts of $29,880 and $400,495 in petitioners' Federal income taxes for 1976 and 1977, respectively.

After concessions by both parties, the issues remaining for decision are:

(1) Whether petitioners realized ordinary income under section 1245[1] due to the foreclosure of a mortgage on their cruise vessel, the Xanadu, in 1977; and

(2) Whether petitioners are entitled to a bad debt deduction in the amount of $1,101,779 in either 1976 or 1977.

### FINDINGS OF FACT

At the time the petition was filed, petitioners resided in Seattle, Wash. They filed joint Federal income tax returns for 1976 and 1977 with the Internal Revenue Service Center, Ogden, Utah. Petitioners filed these returns using a cash method of accounting.

In the first half of 1974, petitioners purchased the cruise ship, Xanadu for $1,600,000. Subsequently, they claimed depreciation deductions for it on their Federal income tax returns as follows:

| Year | Depreciation claimed |
|------|---------------------|
| 1974 | [1]$234,740 |
| 1975 | 360,000 |
| 1976 | 400,000 |
| 1977 | 296,329 |
| Total | 1,291,069 |

[1]The depreciation figure for 1974 reflects an adjustment made by respondent in an examination of petitioners' income tax return for that year.

On April 1, 1974, petitioners entered into a "Bareboat

---

[1]All section references are to the Internal Revenue Code of 1954 as in effect during the tax years in issue, unless otherwise noted.

Charter Party Agreement" with Xanadu Cruises, Inc. (hereinafter the corporation), a Panamanian corporation[2] wholly owned by petitioners.[3] Under this charter agreement, petitioners leased the Xanadu to the corporation. The agreement, which was to be in effect "for a period of about three (3) years," called for delivery of the Xanadu to the corporation on or before May 25, 1974. The corporation agreed to pay petitioners $27,000 per month for the use of the Xanadu. However, no rent was ever paid by the corporation under the agreement because the corporation never had any money with which to make the payments.

In October 1975, petitioners, as individuals, entered into a loan agreement with Seattle-First National Bank (Seafirst). Petitioners signed a note payable to Seafirst, the face amount of which was placed in a "bank control account." Subsequently, as needed to cover overdrafts of the corporation, Seafirst transferred funds from the "bank control account" to the corporation's account. At the time of each such transfer, the corporation (by petitioner June A. Eisenberg) executed a note payable on demand to petitioners in the amount of the funds transferred to cover the overdraft, with interest at the rate of 12 percent. Under this arrangement, the following notes payable to petitioners were executed by the corporation:

| Date | Amount |
|---|---|
| Oct. 13, 1975 | $296,200.19 |
| Oct. 15, 1975 | 20,000.00 |
| Oct. 23, 1975 | 50,000.00 |
| Oct. 31, 1975 | 60,000.00 |
| Nov. 7, 1975 | 10,000.00 |
| Nov. 28, 1975 | 9,469.96 |
| | 445,670.15 |

Balance sheets of the corporation prepared as of various dates during the period December 31, 1975, through October

---

[2] The corporation has not filed any Federal income tax returns.

[3] In addition to owning all of the stock of the corporation, petitioners were its officers and directors. The corporation was organized by petitioners in order to operate the Xanadu under the Panamanian flag.

31, 1976, show as a liability a "Long Term Note—A.J.E." in the amount of $435,670.[4] The balance sheet of the corporation as of October 31, 1975, shows a deficit (or "negative surplus") of $733,241.

The corporation, which commenced operations on May 21, 1974, consistently lost money from operating the Xanadu as a cruise ship. By July 31, 1975, the corporation had incurred a deficit of $497,983, and by October 31, 1976, its deficit had increased to $1,529,062. After October 31, 1976, the Xanadu was not operated by the corporation as a cruise ship, and the corporation did no other business. However, the corporation was not formally dissolved.

From October 1976 through March 1977, the Xanadu was moored in Vancouver Harbor, Vancouver, B.C. On March 1, 1977, the Canadian National Railway Co. (CNRC) began legal action in Vancouver to sell the Xanadu for past due moorage fees, and the sheriff in Vancouver seized the Xanadu on behalf of CNRC.

Prior to the Xanadu's seizure, petitioners, in their individual capacity, had filed a chapter XI bankruptcy proceeding. On May 31, 1977, the trustee in bankruptcy abandoned any claim to the Xanadu as an asset of the estate because petitioners had no equity in it. In addition to the claims of CNRC against the Xanadu for moorage fees, petitioners owed Seafirst over $2 million, secured by a mortgage on the Xanadu.

On June 7, 1977, Seafirst filed a claim in the Federal Court of Canada against the Xanadu based on the nonpayment of the mortgage notes, and the sheriff in Vancouver seized the Xanadu on behalf of Seafirst. CNRC released its seizure of the Xanadu on June 24, 1977.

On October 4, 1977, Seafirst began proceedings in the Canadian court for the sale of the Xanadu. That court ordered that the minimum upset price at which the Xanadu could be sold was $925,000. Seafirst was granted leave to bid as a purchaser at the sale. If the purchase price so bid exceeded (1) certain costs incurred in connection with the proceedings for the sale, plus (2) an amount sufficient to secure all prior claims against the proceeds of the sale, Seafirst would be permitted to

---

[4] The reason for the $10,000 difference between this figure and the total amount of the notes executed by the corporation is not clear from the record.

set off against the purchase price the amount due to it pursuant to the mortgage on the Xanadu. Proceeds of the sale were, however, to be paid into the Federal Court of Canada "to the credit of all actions in Rem against" the Xanadu, and "all questions respecting the priority of all such creditors to the proceeds of the sale" were to be reserved for later determination.

Seafirst purchased the Xanadu at a sheriff's auction held on December 8, 1977, for $925,000 in Canadian funds ($842,814 U.S.).[5] This sum was paid to the Receiver General for Canada, as a payment into the Federal Court of Canada. Upon payment of the purchase price, a bill of sale for the Xanadu dated December 16, 1977, was issued to Seafirst by the marshal, County of Vancouver, region 2.[6]

On January 23, 1978, a meeting of creditors was held and all claims, along with that of Seafirst, were filed and considered. On March 20, 1978, the Receiver General for Canada distributed $576,000 (Canadian) to Seafirst from the proceeds of the sale. On March 24, 1978, Seafirst formally credited these moneys (after conversion to $510,336 U.S.) to reduce a $1 million indebtedness of petitioners represented by a note dated October 13, 1975. Subsequently, the Federal Court of Canada ordered certain distributions to claimants other than Seafirst against the proceeds of the sale, including a distribution to the marshal of the County of Vancouver, for expenses incurred in seizing and selling the Xanadu.

On September 26, 1978, Seafirst and petitioners entered into a "Stipulation and Settlement Agreement" which constituted a complete settlement of all existing claims between them and which provided, in part, that petitioners were to execute a new note payable to Seafirst in the face amount of $1,300,000. The

---

[5]The $842,814 figure is based on the exchange rate for the Canadian dollar that respondent represents on brief was used in determining the deficiency against petitioners (i.e., $0.91115). Our research indicates that the exchange rate was slightly higher on both the date of the sale of the Xanadu and the date that Seafirst actually paid the purchase price. See the Dec. 9, 1977 (p. 32), edition of the Wall Street Journal showing an exchange rate of $0.9168 for Dec. 8, 1977, and the Dec. 19, 1977 (p. 21), edition of that paper showing an exchange rate of $0.9120 for Dec. 16, 1977. Nevertheless, we accept the rate used by respondent.

[6]Under order of the Federal Court of Canada, the marshal was "vested with the right and power to execute a Bill of Sale transferring the Ship 'Xanadu' to the successful purchaser."

agreement further provided that the net amount of all funds distributed to Seafirst by the Federal Court of Canada from the proceeds of the sale of the Xanadu would be credited toward payment of the new promissory note.

Seafirst received its second and final distribution from the proceeds of the sale on November 9, 1978, in the amount of $225,263.97 (Canadian). This amount (less certain expenses, and after conversion to $190,205.65 U.S.) was applied to reduce the balance owing on the $1,300,000 note.[7]

On their joint Federal income tax return for 1977, petitioners claimed a loss from the seizure and sale at public auction of the Xanadu, computed as follows:

| | |
|---|---|
| Cost .............................................. | $1,600,000 |
| Depreciation .................................... | 1,291,069 |
| Amount of loss (adjusted basis) ............ | 308,931 |

On March 1, 1977, petitioners were notified by respondent that deficiencies in income tax for 1972, 1973, 1974, and 1975 were being assessed against them under section 6871(a) (relating to claims for taxes in bankruptcy and receivership cases). Among the adjustments to petitioner's income contained in the notice were increases in "gross rents" for 1974 and 1975 in the respective amounts of $262,909 and $403,200 (a total for both years of $666,109). By way of explanation, the notice stated that the charter of the Xanadu to the corporation "was not at arm's-length terms" and that gross rental income was being allocated to petitioners under the authority of section 482. The notice further stated that "this allocation is necessary to prevent the evasion of taxes and to clearly reflect" petitioners' income.[8]

Petitioners filed amended joint Federal income tax returns (Forms 1040X) for 1976 and 1977 with the Internal Revenue Service Center, Ogden, Utah. On each of these amended

---

[7]Apparently, the face amount of this note reflected the reduction in petitioners' total indebtedness to Seafirst which resulted from the application of the first distribution ($510,336 U.S.) to the $1 million note.

[8]The evidence before this Court, as stated above, reflects that petitioners were entitled to rent of $27,000 per month for the use of the Xanadu and that the corporation was financially unable to pay that rent. The record does not show the basis for this sec. 482 allocation of rent for 1974 and 1975, and its validity is not in issue in this case.

returns, they claimed a deduction in the amount of $1,101,779, as follows:

Rent receivable—Xanadu Cruises, Inc .................... $666,109
Note receivable—Xanadu Cruises, Inc .................... 435,670
                                                       1,101,779

The amount of the rent receivable from the corporation represents the total "gross rents" allocated to petitioners by respondent under section 482 for 1974 and 1975. The note receivable reflects the amount due petitioners from the corporation on notes executed at the time of transfers of funds by Seafirst to cover overdrafts of the corporation.

In the notice of deficiency issued with respect to 1976 and 1977 here in controversy, respondent determined that "the bad debt deduction claimed on 1040-X for 1976 and 1977 is not allowable because you have not established either the receivables or note were worthless in either 1976 or 1977." Accordingly, he disallowed for each of those years the $1,101,779 deduction claimed by petitioners. Respondent further determined that petitioners realized ordinary income under section 1245 due to the foreclosure of the Seafirst mortgage on the Xanadu. Therefore, he disallowed the loss from the seizure and sale of the Xanadu claimed by petitioners and increased their income for 1977, as follows:

Proceeds (U.S. funds) .................................. $842,814
Cost ................................. $1,600,000
Less depreciation ................ 1,291,069     [1]308,931
Ordinary gain ......................................... 533,883
Loss claimed on return ............................. 308,931
Adjustment ............................................ 842,814

[1] In the notice of deficiency, this figure (the difference between the cost of the Xanadu and the total depreciation claimed with respect to it) was erroneously shown as $408,931.

OPINION

*1. Section 1245 Income Realization Issue*

The first issue for decision is whether petitioners in 1977 realized a gain upon the foreclosure sale of the Xanadu. Section 1001[9] provides in part that, with certain exceptions not

9SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis

relevant here, the entire amount of any gain realized on the "sale or exchange" of property shall be recognized. Under section 1245,[10] gain from the disposition of personal property is to be treated as ordinary income to the extent it is attributable to depreciation deductions allowed to the taxpayer after 1961. Petitioners do not dispute that any gain realized on the foreclosure sale must be treated as ordinary income;[11] thus, we need only determine whether they, as cash basis taxpayers, realized a gain in 1977.

Petitioners argue that, as cash basis taxpayers, they re-

---

provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

    *        *        *        *        *        *        *

(c) RECOGNITION OF GAIN OR LOSS.—Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.

[10]SEC. 1245. GAIN FROM DISPOSITIONS OF CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—

(1) ORDINARY INCOME.—Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of—

(A) the recomputed basis of the property, or

(B)(i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

(ii) in the case of any other disposition, the fair market value of such property, exceeds the adjusted basis of such property shall be treated as ordinary income. Such gain shall be recognized notwithstanding any other provision of this subtitle.

(2) RECOMPUTED BASIS.—For purposes of this section, the term "recomputed basis" means—

(A) with respect to any property referred to in paragraph (3)(A) or (B), its adjusted basis recomputed by adding thereto all adjustments, attributable to periods after December 31, 1961, * * * reflected in such adjusted basis on account of deductions (whether in respect of the same or other property) allowed or allowable to the taxpayer or to any other person for depreciation * * * . For purposes of the preceding sentence, if the taxpayer can establish by adequate records or other sufficient evidence that the amount allowed for depreciation * * * for any period was less than the amount allowable, the amount added for such period shall be the amount allowed. * * *

(3) SECTION 1245 PROPERTY.—For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either—

(A) personal property, * * *

[11]In this connection, see *Estate of Delman v. Commissioner*, 73 T.C. 15, 34–37 (1979), holding that gain realized upon the repossession of property was ordinary income under sec. 1245.

ceived no income of any kind in 1976 or 1977 from the Xanadu as a result of the foreclosure. They maintain that any gain on the foreclosure sale is taxable in 1978 when Seafirst applied the distributions in reduction of petitioners' indebtedness. Respondent's position is that, upon the issuance of the bill of sale to Seafirst on December 16, 1977, the foreclosure sale was a closed transaction[12] and, therefore, the gain is taxable in that year. Respondent acknowledges that the amount realized by petitioners should be reduced by direct selling expenses, but contends that there is no evidence concerning such expenses and that petitoners are taxable in 1977 on the entire proceeds of the sale less their adjusted basis. Citing *Healy v. Commissioner*, 345 U.S. 278, 284 (1953), respondent suggests that adjustments for distributions of part of the proceeds to other creditors may be made in 1978.

It is well settled that a foreclosure sale is a "sale or exchange" for the purposes of Federal income taxation. *Helvering v. Hammel*, 311 U.S. 504 (1941); *R. O'Dell & Sons Co. v. Commissioner*, 169 F.2d 247, 248 (3d Cir. 1948), affg. 8 T.C. 1165 (1947). The taxable year in which any gain realized on such a sale becomes taxable to a cash basis taxpayer, as in the case of petitioners, depends on when the income is actually or constructively received[13] by the taxpayer. Sec. 1.451–1(a), Income Tax Regs.

Respondent is no doubt correct that a foreclosure sale, like a voluntary sale, is the definitive event that establishes gain or loss. *Helvering v. Hammel, supra* at 512. In the ordinary foreclosure action which has become final, however, the gain or loss is recognized "in the year in which the property is disposed of *and* the debt discharged." (Emphasis added.) *R. O'Dell & Sons Co. v. Commissioner*, 8 T.C. at 1167; *Lutz & Schramm Co. v. Commissioner*, 1 T.C. 682, 688 (1943). It is clear in the instant case that petitioners received no benefit in 1977

[12]The bill of sale does not indicate, nor has it been suggested, that petitioners had any right of redemption following the foreclosure sale. See generally *R. O'Dell & Sons Co. v. Commissioner*, 169 F.2d 247 (3d Cir. 1948), affg. 8 T.C. 1165 (1947).

[13]As provided in sec. 1.451–2(a), Income Tax Regs., income is constructively received by a taxpayer when—

"it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time * * * . However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions."

from the proceeds of the foreclosure sale of the Xanadu pursuant to the order of the Canadian court. As detailed in our findings, the foreclosure sale was part of an action in rem against the Xanadu, and the proceeds of the sale were to be deposited in the registry of the court with all questions respecting the priority of creditors' claims to be reserved for later determination. Until the priority of those claims was fixed by the court, petitioners were entitled to nothing; the amount which would be ultimately realized by petitioners from the sale could not be determined.[14]

Seafirst bought the Xanadu at the December 8, 1977, foreclosure sale; it paid the purchase price into the registry of the court and received title to the Xanadu on December 16, 1977. The first meeting of creditors was not held until January 23, 1978. Not until March 20, 1978, did Seafirst receive its first distribution ($510,336 U.S.) as a creditor. In November 1978, the final distribution to Seafirst ($190,205.65 U.S.) was applied on the note petitioners owed to it. Until these 1978 distributions were made, petitioners received no taxable benefit from the sale; we have no reason to think that interest did not continue, for example, to accrue on the bank notes until the distributions were made. We conclude that the sale of the Xanadu produced no taxable income to petitioners in 1977; no portion of the proceeds of the sale was actually or constructively received by petitioners until 1978. See, e.g., *Poczatek v. Commissioner*, 71 T.C. 371, 378 (1978); *Atkins v. Commissioner*, 15 T.C. 128, 133 (1950); *Johnston v. Commissioner*, 14 T.C. 560, 565–566 (1950); *Estate of Paul v. Commissioner*, 11 T.C. 148, 151–152 (1948). Cf. *Aldridge v. Commissioner*, 51 T.C. 475, 481 (1968) (condemnation award proceeds were "held subject to the order of the [State] court," but it did not appear that the taxpayers' right to withdraw such proceeds was subject to any limitation or restriction sufficient to prevent a finding of constructive receipt).

---

[14]It should be emphasized that the action by Seafirst was an action in rem against the Xanadu and that claimants against the proceeds of the sale included not only creditors of petitioners, but, as well, creditors of the corporation whose in rem claims against the Xanadu had arisen as a result of its operation as a cruise ship, its moorage, and its sale on foreclosure.

## 2. Section 166 Bad Debt Deduction Issue

The only other issue for determination is whether petitioners are entitled to a bad debt deduction of $1,101,779 in either 1976 or 1977. As indicated in our findings of fact, petitioners' claimed bad debt deduction is based upon (1) rental income allocated to petitioners for 1974 and 1975 under section 482, but never actually paid to them ("Rent Receivable" on their Form 1040X), and (2) notes payable to petitioners executed by the corporation ("Note Receivable"). Respondent disallowed the claimed deduction on the ground that petitioners had "not established either the receivables or note were worthless" in either 1976 or 1977.

In his opening statement at the trial, counsel for respondent further explained respondent's position as being that no receivable results from an adjustment under section 482 and that, if there is such a receivable, there is no evidence to show that it became worthless or was a business bad debt. With respect to the "Note Receivable," counsel for respondent stated: "we have the same problems. There is no evidence concerning its worthlessness in either of the two years that we have, or if it did become worthless, it was business bad debt."[15]

We find petitioners' claim for a bad debt deduction based on the worthlessness of a "receivable" purportedly arising from the section 482 allocation for 1974 and 1975 to be without merit.[16] That issue was decided adversely to petitioners' position in *Cappuccilli v. Commissioner*, 668 F.2d 138 (2d Cir. 1981), affg. a Memorandum Opinion of this Court; the court there held that "Neither the law nor common sense" supports a deduction for a bad debt based on a section 482 allocation.

---

[15]No objection or claim of surprise was made by petitioners with respect to respondent's elaboration of his position on the claimed bad debt deduction. On brief, however, petitioners argue that the question of the existence of the $1,101,779 indebtedness is not in issue. We find that petitioners have shown the existence of the indebtedness represented by the notes receivable, as discussed *infra*. We think respondent is entitled to argue that no receivable arose from the sec. 482 gross rental allocation for 1974 and 1975, because this argument hinges solely upon undisputed facts of record. Compare *Standard Oil Co. v. Commissioner*, 43 B.T.A. 973, 998–999 (1941), affd. 129 F.2d 363 (7th Cir. 1942). Apart from the question of the existence of the indebtedness for which petitioners claim a bad debt deduction, petitioners apparently concede that they have the burden of proving entitlement to the claimed deduction.

[16]The correctness of the allocation, we emphasize, is not before us. See note 8 *supra*.

Section 482 permits the respondent to allocate income among commonly controlled organizations, trades, or businesses in order to clearly reflect their income. A bad debt deduction, on the other hand, is allowable under section 166 only with respect to a bona fide debt.[17] The allocation of rental income pursuant to section 482 does not create a debt obligation; such an allocation is designed merely to accurately reflect the taxpayer's income. To allow petitioners a bad debt deduction for 1977 based on the 1974 and 1975 section 482 allocation would, in effect, retroactively nullify that allocation. Moreover, an allocation of income under section 482 is properly offset by a correlative deduction for the commonly controlled organization from which income was allocated. Sec. 1.482–1(d)(2), Income Tax Regs.[18] Petitioners are not, in addition, entitled to a bad debt deduction on the ground that they did not actually receive the allocated income.[19] *Cappuccilli v. Commissioner, supra.*

With respect to the portion of petitioners' claimed bad debt deduction based on notes receivable in the amount of $445,670 executed by the corporation to petitioners, respondent argues that petitioners have failed to prove that Seafirst made advances to the corporation to cover overdrafts or that

[17]Sec. 1.166–1(c), Income Tax Regs., provides in part as follows:

"Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."

[18]Here, it appears that the corporation was not in a position to benefit from any correlative adjustment (i.e., deduction) based on the allocation of rental income to petitioners. However, sec. 1.482–1(d)(2), Income Tax Regs., provides in part:

"If a correlative adjustment is not actually made because it would have no effect on the United States income tax liability of the other member involved in the allocation for any pending taxable year, such adjustment shall nevertheless be deemed to have been made for the purpose of determining the United States income tax liability of such member for a later taxable year, or for the purposes of determining the United States income tax liability of any person for any taxable year."

See also *Collins Electrical Co. v. Commissioner,* 67 T.C. 911 (1977).

[19]Rev. Proc. 65–17, 1965–1 C.B. 833, sets forth procedures to be followed by a taxpayer who requests permission to receive payment from the entity from which income was allocated under sec. 482 without further Federal income tax consequences. If respondent determines that the transaction giving rise to the allocation was not intended to avoid taxes, the taxpayer is entitled to establish an account receivable which can be paid without tax consequences under carefully defined circumstances. We do not agree with petitioners that, because Rev. Proc. 65–17 recognizes the concept of an account receivable in certain circumstances in order to avoid the double taxation of income, it is only fair that they be allowed a bad debt deduction here.

petitioners became personally liable for such advances. However, the record clearly shows that on October 13, 1975, the date on which the corporation executed its first note, petitioners signed a note payable to Seafirst on demand in the principal amount of $1 million. This note established a line of credit which was used to cover the corporation's overdrafts. The record also contains a series of the corporation's balance sheets for periods ended between December 31, 1975, and October 31, 1976, and each of these balance sheets shows a $435,670 liability to "A.J.E." The entry, we infer, was intended to identify petitioner Arthur Joel Eisenberg. Based on this evidence and on petitioner Arthur Joel Eisenberg's uncontradicted testimony concerning the manner in which advances were made to the corporation, we are convinced that Seafirst did make such advances to the corporation and that petitioners were personally liable for them.[20]

Respondent further argues that petitioners have failed to show the worthlessness of any debt of the corporation. On the record before us, we think it clear that the debt represented by the notes became worthless in late 1976. In prior years, the corporation had lost large amounts of money from its operations and had no prospects of recovery. As of October 31, 1976, the corporation was hopelessly in debt (with a deficit in excess of $1,500,000) and at that time ceased doing any sort of business (although it was not formally dissolved).[21] Cf. *Pachella's Estate v. Commissioner*, 310 F.2d 815, 816 (3d Cir. 1962), affg. 37 T.C. 347 (1961). The corporation's debt to petitioners was unsecured (sec. 1.166–2(a), Income Tax Regs.), and an examination of the corporation's balance sheet as of October 31, 1976, shows that, as a practical matter, liquidation of its few remaining assets would not produce any appreciable amount to apply on petitioners' debt claim. We hold that any

---

[20]On brief, respondent argues for the first time that petitioners' advances to the corporation were actually equity contributions, not loans. As this argument was not raised in the deficiency notice, the pleadings, or the opening statements at trial, it is not properly before us. (See *Aero Rental v. Commissioner*, 64 T.C. 331, 338 (1975).) Thus, we do not consider it.

[21]Compare *Estate of Jewett v. Commissioner*, a Memorandum Opinion of this Court dated June 24, 1949.

expectation of repayment by the corporation terminated in 1976.

Finally, respondent argues that the worthlessness of the debt between the corporation and petitioners resulted in a nonbusiness bad debt under section 166(d).[22] In order for us to find a business bad debt, it must appear that petitioners' advances were proximately related to a trade or business of petitioners, i.e., to their status as employees of the corporation or lessors of the Xanadu,[23] rather than as investors in the corporation. See *United States v. Generes*, 405 U.S. 93, 96 (1972); *Benak v. Commissioner*, 77 T.C. 1213 (1981); *Shinefeld v. Commissioner*, 65 T.C. 1092, 1096 (1976). Petitioners point out only that the advances were used to assist the corporation in its business of operating the Xanadu as a cruise ship. This information reveals little in terms of the relationship of the advances to petitioners' status as employees, lessors, or investors; no doubt the advances were to some extent motivated by a desire to protect their status in all three capacities. We think, however, that petitioners' dominant motive was to provide funds, as owners of the corporation, needed to enable it to continue its operations. See *United States v. Generes, supra* at 103–105. On this issue we must hold for the respondent.[24]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[22]SEC. 166. BAD DEBTS.

(d) NONBUSINESS DEBT.—

*     *     *     *     *     *     *

(2) NONBUSINESS DEBT DEFINED.— * * * the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

[23]For this purpose, we assume that the leasing of the Xanadu could be considered to be a trade or business of petitioners.

[24]See note 15 and the accompanying text, *supra*.