LEONARD W. SAPP AND LOLA L. SAPP, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sapp v. Commissioner
Docket No. 21610-90
United States Tax Court
T.C. Memo 1993-211; 1993 Tax Ct. Memo LEXIS 213; 65 T.C.M. (CCH) 2650; May 17, 1993, Filed *213 P entered into a transaction with his son-in-law, G, whereby G's limited partnership, L, acquired P's land and building in exchange for farm acreage, a purchase money obligation and cash. A condition of closing was that L obtain a letter of credit from F, a savings and loan association, assuring availability of funds under an industrial development bond issue with which to purchase the land and building and rehabilitate the building. As a condition for issuing the letter of credit F insisted upon retaining the cash in a certificate of deposit account with F, the funds to be released only upon satisfaction in later years of certain conditions subsequent. Held, Ps did not actually or constructively receive the withheld funds in the taxable year in question. Held, further, Ps are not liable for additions to tax under secs. 6653(a)(1)(A) and (B) and 6661(a), I.R.C.
For petitioners: R. Stephen Scott. For respondent: Michael W. Bitner. NIMS
NIMS
MEMORANDUM OPINION NIMS, Judge: Respondent determined the following deficiency and additions to tax against petitioners: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661(a)
1986
$ 68,391
$ 3,420
*
$ 17,098
*214 Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for 1986. All Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are (1) whether a certificate of deposit in the amount of $ 800,000, received as part of the proceeds from a sale of real estate and pledged as security in a related transaction, is includable in petitioners' income for the taxable year 1986, and (2) whether all or part of any underpayment of tax due from petitioners was due to negligence. Respondent has also determined that there was a substantial understatement of tax for 1986 under section 6661(b)(1). Petitioners contend that the certificate of deposit was required to be pledged as a condition of its receipt and was not actually or constructively received in 1986. Respondent argues that the certificate of deposit was received in a real estate transaction and pledged in a separate transaction, and therefore *215 represented taxable income in 1986. This case was submitted fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. The stipulation of facts consists of 13 numbered paragraphs which superficially describe the transaction (or transactions) giving rise to respondent's deficiency determination, and 30 documents, a majority of which were involved in the events under scrutiny. These stipulated documents include Illinois Land Trust Agreement; Agreement for Sale of Real Estate; Trust Indenture; First Supplemental Trust Indenture; Supplemental and Restated Trust Indenture; Irrevocable Letter of Credit; Irrevocable Letter of Credit (revised); Standby Liquidity Facility Agreement; Reimbursement Agreement; Unconditional Guaranty of Payment and Performance; Pledge Agreement; Ordinance Authorizing the City of Springfield to Execute a Second Supplemental and Restated Loan Agreement and a Second Supplemental and Restated Trust Indenture with Regard to its Variable Rate Demand Community Improvement Revenue Bonds, Series 1985 (Landmark Central, Ltd. Project) and Approving Other Actions in Respect Thereto, dated August 5, 1986; Second Supplemental *216 and Restated Loan Agreement; Amended and Restated Pledge Agreement; Unconditional Guaranty of Payment and Performance; Hedge Agreement; First Supplemental Mortgage and Security Agreement; First Supplemental and Restated Loan Agreement; Illinois National Bank Transaction Display; and Summary of Illinois National Bank Transaction Display (which can be tied only in part to the document it is meant to summarize). Neither party has made any effort to synthesize this mountain of prolixity into any kind of coherent whole. No testimony was presented which would assist us in limning the overall concept. Consequently, we proceed as best we can with the materials at hand, bearing in mind that to a substantial extent we have been forced to draw factual conclusions based upon what we consider to be reasonable inferences from the arcane language of the documents; e.g., that the keystone transaction was an industrial development bond financing undertaken pursuant to section 103(b), although at no point do the parties make any reference to this apparently central fact. Petitioners are husband and wife, and resided in Springfield, Illinois, at the time they filed their petition. Leonard W. Sapp *217 (petitioner) is a realtor and real estate developer, and operates through a sole proprietorship known as L.W. Sapp Construction. In 1985 petitioners were the beneficial owners of the "Ninth Street Property" located in Springfield, Illinois, title to which was held in an Illinois Land Trust. (For convenience, at times we refer to petitioner alone as the owner of the Ninth Street Property, although both petitioners were on the title.) Certain improvements on the Ninth Street Property included, among others, a structure called the Public Aid Building. During 1985 and 1986, petitioners' son-in-law, Glen Garrison (Garrison), held a 90-percent interest in Landmark Central, Ltd. (Landmark Central), an Illinois limited partnership. Garrison is also a realtor and real estate developer. The remaining 10 percent of Landmark Central was held by 9th Street Place, Ltd. (9th Street Place), an S corporation, as the general partner. During 1985 and 1986 Garrison owned all of the stock of 9th Street Place. On December 16, 1985, The First National Bank of Springfield, as Trustee of the Illinois Land Trust, entered into an Agreement for Sale of Real Estate (Agreement of Sale) with Landmark Central, *218 whereby the Bank agreed to sell on petitioners' behalf the Ninth Street Property to Landmark Central for $ 4,500,000. The Agreement of Sale provided, among other things, that: "Seller reserves the right to exchange * * * [the Ninth Street Property] for other property so as to comply with Section 1031"; that the closing would take place on May 15, 1986, or at some other agreed upon time; and that [Landmark Central's] obligations under this Agreement are subject to [Landmark Central] obtaining the Letter of Credit (as that term is defined in a Trust Indenture dated as of December 1, 1985, between the City of Springfield, Illinois, and The Illinois National Bank of Springfield, as Trustee, securing Community Improvement Revenue Bonds (Landmark Central, Ltd. Project) Series 1985 (the "Indenture"), described in the Indenture on or before April 1, 1986 or such other date as may be mutually agreed upon in writing by the Trustee (as defined in the "Indenture"), the Initial Purchaser (as defined in the "Indenture") and * * * [Landmark Central], but in no event shall such date be after June 27, 1986.
An "Irrevocable Letter of Credit" dated June 27, 1986 (and subsequently revised August *219 6, 1986) was issued by Franklin Savings Association (Franklin Savings), a Kansas chartered stock savings and loan association, pursuant to the industrial development bond transaction referred to infra. The Irrevocable Letter of Credit was issued by Franklin Savings in favor of the industrial development bond trustee to secure the latter against default by Landmark Central, the recipient of the ostensible bond proceeds, in the repayment of the bond principal and interest when due. At some time during 1986, the land trust trustee deeded the Ninth Street Property to petitioners, who then conveyed it to Landmark Central for $ 4,500,000, made up of (a) 2,250 acres of farmland located in Greene County, Illinois, the farmland having been acquired by Landmark Central for purposes of making the exchange; (b) Landmark Central's promissory note in the amount of $ 1,037,449; and (c) $ 800,000 to be paid in cash. Both the Ninth Street Property and the farmland had been previously encumbered, with the encumbrance on the Ninth Street Property exceeding that on the farmland by $ 15,551. Respondent does not challenge petitioners' treatment of the property exchange as a like-kind exchange under *220 section 1031 on their 1986 return. At some point, either before or after the exchange, the Ninth Street Property was used as security for a $ 2,700,000 wrap-around conventional loan in favor of Franklin Savings. Landmark Central financed its acquisition and projected rehabilitation of the Ninth Street Property by means of a City of Springfield, Illinois, industrial development bond issuance in the face amount of $ 6,390,000. The record does not disclose the actual source of these funds, i.e., the purchaser of the bonds, although in a so-called Standby Liquidity Facility Agreement Franklin Savings agreed to purchase the bonds if and when tendered to it under certain conditions. Marine Bank of Springfield and The Illinois National Bank of Springfield were Trustee and Co-Trustee, respectively, under a Supplemental and Restated Trust Indenture entered into in connection with issuing and securing repayment of the bonds. The "Illinois National Bank Transaction Display" stipulated by the parties gives some indication, through debit and credit entries between Illinois National Bank and Franklin Savings, that one (or perhaps both) of these institutions was the ultimate source of the funds *221 lent to Landmark Central pursuant to the industrial development bond arrangement. In a Pledge Agreement dated as of June 27, 1986, between petitioner and Franklin Savings, petitioner agreed to pledge to the Illinois National Bank, as Trustee under the bond indenture, "in the first priority," and Franklin Savings, "in the second priority," a security interest in an $ 800,000 certificate of deposit issued in petitioner's name by Franklin Savings and to be held by Franklin Savings for the joint benefit of the pledgees. The $ 800,000 represented a portion of the amount due petitioner under the Agreement of Sale, and the funds were part of the proceeds of the bond sale. The preamble to the Pledge Agreement contains a number of recitals, including a statement that at the request of Landmark Central, Franklin Savings would issue an irrevocable direct-pay letter of credit as a liquidity and credit support for the Bonds. A provision of a Reimbursement Agreement between Franklin Savings and Landmark Central covered the conditions under which the $ 800,000 represented by the certificate of deposit pledged by petitioner could be released to petitioner. Under this provision petitioner could *222 obtain partial releases in increments of not less than $ 200,000, after the completion of the Ninth Street Property rehab project, by showing that no events of default had occurred and that "1.2 Debt Service Coverage" had been achieved by Landmark Central and would continue to be achieved. Petitioner could also recover his $ 800,000 certificate of deposit by substituting collateral of equal value and risk. The record does not reveal that any of these events occurred in 1986. On October 27, 1989, an officer of Franklin Realty, a division of Franklin Savings, wrote petitioner as follows: Dear Mr. Sapp: As requested by you, we are confirming our requirements regarding the certificate of deposit we are holding the the [sic] amount of $ 800,000.00. At the date of closing, June 27, 1986, we were unwilling to exceed the "Risk Amount" as defined in our agreements with respect to the Landmark Central project. At that time proceeds were placed in a certificate of deposit, interest on which is pledged to Franklin Savings Association. We will release this collateral upon the occurrence of one of the following events: (a) substitution of other suitable collateral, or (b) when *223 net operating income exceeds 120% of debt service on the Landmark Central project for 12 consecutive months.
The $ 800,000 certificate of deposit remained at Franklin Savings until June 4, 1990. At that time, there was transferred by Franklin Savings to petitioner's account number 41-602, at First of America Bank, Springfield, Illinois, the $ 800,000 proceeds of the certificate of deposit, plus accumulated interest of $ 32,429.69. Article II, Section 202 of the Supplemental and Restated Trust Indenture between the City of Springfield, Issuer, and Marine Bank of Springfield, Trustee, and The Illinois National Bank of Springfield, as Co-Trustee, provides, among other things, that the bonds do not constitute a debt of Springfield or the State of Illinois, do not impact Springfield's constitutional or statutory debt limit, that no bond provision or breach thereof will give rise to any pecuniary obligation on the part of Springfield, and in making the various agreements Springfield has not obligated itself except as to the Ninth Street Property rehab project and the application of the payments, revenues and receipts therefrom. This section also provides that the bonds and interest *224 are limited obligations of Springfield payable exclusively out of the net proceeds from the rehab project. In the Second Supplemental and Restated Loan Agreement between Springfield and Landmark Central, Landmark Central represented, among other things, that the industrial development bond issue will not be in conflict with sections 103(b)(6)(C), 103(b)(14), 103(b)(15), 103(b)(16), 103(b)(17)(B), 103(b)(18), 103(h), and that there are no other previously issued or to be issued industrial development bonds within the meaning of section 103 for the benefit of Landmark Central. Specifically with regard to section 103(b)(17)(B), Landmark Central represented that the rehab expenditures with respect to the building on the Ninth Street Property will equal or exceed 15 percent of the portion of the cost of acquiring such building financed with the proceeds of the bonds. On January 2, 1987, petitioner acquired a 45 percent interest in Landmark Central from Garrison for $ 45 and assumption of 45 percent of Landmark Central's obligations. During 1988, petitioner acquired 20 percent of the outstanding stock of 9th Street Place, the general partner of Landmark Central, from Garrison. Respondent *225 has not asserted that petitioner and Garrison are related parties within the meaning of section 103(b)(6)(C), 267 or 707(b). Petitioners' 1986 individual income tax return was prepared by Gerald L. Kuhn & Associates, CPAs. Such preparers relied on (1) the same documents stipulated as Exhibits in this case, which documents pre-date the filing of the return, and (2) the representations of petitioner and petitioner's employees (a) that the availability of the $ 800,000 certificate of deposit account at Franklin Savings was substantially restricted; (b) that the petitioner had never actually received the funds in such account; (c) that the petitioner never had physical control over such funds; and (d) that the project was not then leased. Also, such preparers relied on their knowledge of the tax laws, regulations and tax cases interpreting constructive receipt of sale proceeds and the installment method of accounting. Speaking generally, the facts may be summarized as follows: in 1985 petitioner Leonard Sapp owned heavily mortgaged commercial real estate, on which was located the Public Aid Building, in Springfield, Illinois. He worked out a deal with his son-in-law, Garrison, whereby *226 Landmark Central, a limited partnership controlled by Garrison, would acquire 2,250 acres of farmland and exchange it for the Public Aid Building, a $ 1,037,449 purchase money obligation and $ 800,000 in cash. Landmark Central planned to acquire the Public Aid Building from petitioner as the first step in a rehab project financed by the proceeds of a section 103(b) industrial development bond issue involving the City of Springfield, several local commercial banks and Franklin Savings, a Kansas savings and loan association. One of the conditions of sale was that Landmark Central obtain a letter of credit from Franklin Savings which would help assure the availability of the funds produced by the $ 6,390,000 bond issue, the net proceeds of which were earmarked for Landmark Central's property acquisition and rehab project. One of the many conditions insisted upon by Franklin Savings for issuing the letter of credit was that the $ 800,000 cash proceeds of petitioner's sale of the Public Aid Building to Landmark Central be retained in escrow by Franklin Savings pending assurance that the net operating income from the rehab project, when completed, had exceeded 120 percent of debt service *227 on the project for 12 consecutive months, or until petitioner substituted other suitable and equal collateral. This was apparently accomplished in 1990, but apparently only after petitioner had reduced his selling price by means of acquiring a slightly more than 45 percent interest in Landmark Central through the device of assuming 45 percent of Landmark Central's obligations, which of course included Landmark's purchase money obligation to petitioner. We restate the respective positions of the parties: Respondent's position that petitioners received unfettered control of $ 800,000 cash in 1986 is based upon a bifurcation theory; that the sale envisioned by the Agreement of Sale was accomplished through the delivery of real estate (the farm acreage) having a value of $ 3,700,000 by Landmark Central to petitioners (the $ 1,037,449 promissory note apparently to be disregarded), and the "tendering" by Landmark Central of $ 800,000, by means of which a certificate of deposit was purchased in the name of petitioner at Franklin Savings. Then, the certificate of deposit was "ostensibly" pledged by petitioner on behalf of Landmark Central. Petitioners argue simply that the $ 800,000 was *228 not made available to petitioners for their use in 1986 and was subject to substantial limitations on withdrawal and possible forfeiture. Petitioners have the burden of proof in this fully stipulated case. Rule 142(a); Service Bolt & Nut Co. Trust v. Commissioner, 78 T.C. 812, 819 (1982), affd. 724 F.2d 519 (6th Cir. 1983). We think they have amply sustained that burden. In respondent's reply brief it is stated that: respondent, * * * in her opening brief set forth fairly advanced arguments concerning the question of restrictions being placed on funds after receipt by a taxpayer; including arguments concerning restrictions which might arguably call the doctrine of 'constructive receipt' into play. In other words, the respondent contended that the imposition of post-receipt restrictions on the use of funds will not delay the occurrence of a taxable event during the year of the receipt of such funds.
We would simply point out that no amount of "fairly advanced arguments" is likely to succeed when the arguments proceed from a basically fallacious premise; i.e., that the restrictions were placed upon the funds in *229 question after, rather than before, they were received by petitioner. The facts insofar as we have been able to reconstruct them from the inadequate stipulation presented to us seem to make it clear beyond doubt that petitioners' sale of land and building to Landmark Central and the industrial development bond financing were totally interdependent. Insofar as petitioner's entitlement to the $ 800,000 is concerned, Landmark Central was not required to close the real estate sale unless it could obtain the requisite letter of credit from Franklin Savings, and Franklin Savings was unwilling to issue the letter of credit unless petitioner was willing to pledge the cash proceeds of the sale as partial security for Landmark Central's loan obligations. Franklin Savings was disinclined to release these funds until it could be reasonably assured that the Public Aid Building rehab project was going to be a viable undertaking. To demonstrate this viability, Franklin Savings set up an objective test which Landmark Central had to pass: Franklin Savings required that it be shown that net operating income from the project had exceeded 120 percent of debt service for 12 consecutive months, a condition *230 obviously impossible to satisfy in 1986, the taxable year before us. Respondent argues that petitioners "could have drawn on the funds upon closing in June, 1986" (respondent's underlining), and that the only condition with respect to the Agreement of Sale was that Landmark Central obtain a letter of credit in regard to the revenue bonds, which it did on June 27, 1986. But this argument completely disregards the conditions under which the letter of credit would be issued, which we have just described. Furthermore, we are unable to conceive of anything that might have motivated petitioner to voluntarily have placed the funds at the risk of the rehab project once they had been received free and clear, as respondent suggests was done. Love and affection for one's son-in-law would not necessarily extend that far, and respondent has suggested no pecuniary benefit which might have accrued to petitioner by his voluntarily placing the funds at risk. As a matter of fact, as the record discloses, petitioner found it necessary to assume a substantial amount of Landmark Central's financial obligations in a subsequent year, a fact confirming Franklin Savings' prudence in insisting upon *231 all the collateral it could get in 1986. What seems obvious is that petitioner's real estate transaction simply would not have gone forward had petitioner not been willing to acquiesce in the financial institutions' insistence upon the additional security of the pledge agreement. Section 451(a) provides: (a) GENERAL RULE. -- The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.
Section 1.451-1, Income Tax Regs., provides in pertinent part: (a) General rule. Gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer unless includible for a different year in accordance with the taxpayer's method of accounting. Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. * * * Under the cash receipts *232 and disbursements method of accounting, such an amount is includible in gross income when actually or constructively received. * * *
Section 1.451-2, Income Tax Regs., provides in pertinent part: (a) General rule. Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *
We long ago held, in Johnston v. Commissioner, 14 T.C. 560, 565 (1950), and have consistently since held, that cash not unqualifiedly subject to the demands of a cash basis seller of an asset in a given year is not taxable income to the seller in that year. See also, e.g., Eisenberg v. Commissioner, 78 T.C. 336, 345 (1982). Applying our facts to section 1.451-2, Income Tax Regs., we think *233 petitioners have well established that the cash in question was neither actually reduced to petitioner's possession so as to constitute actual receipt, nor was it "credited to his account, set apart for him, or otherwise made available so that he * * * [could] draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." Furthermore, petitioner's control of the cash in question was, in our opinion, subject to such substantial limitations and restrictions as to rule out any conceivable argument that the cash was constructively received in 1986. In a somewhat different but nevertheless analogous context we have held that as long as a deferred payment agreement is binding between the parties thereto and is made prior to the time when the taxpayer-seller has acquired an absolute and unconditional right to receive payment, then a cash basis taxpayer is not required to report the sales proceeds as income until actually received. Oates v. Commissioner, 18 T.C. 570, 584-585 (1952); affd. 207 F.2d 711 (7th Cir. 1953). For the foregoing reasons we hold that *234 petitioners did not actually or constructively receive the $ 800,000 placed in the certificate of deposit in 1986, and accordingly did not realize taxable income from that source in that year. Since we hold for petitioners on the principal issue, it follows that they are not liable for additions to tax for negligence and substantial understatement of tax under sections 6653(a)(1)(A), 6653(a)(1)(B), and 6661(a). We would add, however, that we have read petitioners' 1986 Federal income tax return and observe that it appears to have been carefully and accurately prepared, and that the transaction under consideration was duly disclosed thereon. Particularly in light of the complexity of the documents and intertwined transactions involved, we would find it difficult to hold petitioners liable for negligence in any event. To reflect the foregoing, Decision will be entered for petitioners. Footnotes
*. 50 percent of the interest due on $ 68,391.↩