T.C. Memo. 1999-229


UNITED STATES TAX COURT


JERRY LEE HARVEY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 9376-88, 7127-92,     Filed July 12, 1999.
            13113-96.


<u>James D. McMaster</u>, for petitioner.

<u>W. Robert Abramitis</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, <u>Judge</u>:  Respondent determined deficiencies in, additions to, and a penalty on petitioner's Federal income taxes as follows:

Docket No. 9376-88

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b) | Sec. 6653(b)(2) | Sec. 6654 | Sec. 6661 |
| 1978 | $1,161,317 | $580,659 | -- | $37,226 | -- |
| 1979 | 1,246,774 | 623,387 | -- | 52,098 | -- |
| 1980 | 364,056 | 182,028 | -- | 23,197 | -- |
| 1981 | 464,416 | 232,208 | -- | 35,585 | -- |
| 1982 | 621,489 | 310,745 | 50% of the interest due on $621,489 | 60,604 | $155,372 |
| 1983 | 172,038 | 86,019 | 50% of the interest due on $172,038 | 10,317 | 43,010 |

Docket No. 7127-92

| | | Additions to Tax | | | Penalty |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)[1] | Sec. 6654 | Sec. 6661 | Sec. 6663(a) |
| 1985 | $439,711 | $242,631 | -- | $116,760 | -- |
| 1986 | 132,645 | 99,484 | -- | 33,161 | -- |
| 1987 | 74,789 | 56,092 | $4,039 | -- | -- |
| 1988 | 76,808 | 57,606 | 4,913 | -- | -- |
| 1989 | 98,870 | -- | 6,685 | -- | $74,153 |

[1]For returns required to be filed after Sept. 3, 1982, and before Dec. 31, 1986, if the penalty under sec. 6653(b)(1) applies, the penalty under sec. 6653(b)(2) will also apply in an amount to be determined. For returns required to be filed after Dec. 31, 1986, and on or before Dec. 31, 1988, if the penalty under sec. 6653(b)(1)(A) applies, the penalty under sec. 6653(b)(1)(B) will also apply in an amount to be determined.

Docket No. 13113-96

| | | Addition to Tax |
|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) |
| 1992 | $158,621 | $39,655 |

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

The issues for decision are:[1]  (1) Whether a 1980 plea agreement in Mobile, Alabama, between petitioner and the Government precludes respondent from determining deficiencies in taxes owed by petitioner.  We hold it does not.  (2) Whether respondent's use of petitioner's Cayman Islands records was improper because it violated grand jury secrecy rules.  We hold it was not.  (3) Whether respondent's use of petitioner's Cayman Islands records was improper because it violated a treaty between the United Kingdom and the United States regarding Cayman Islands information.  We hold petitioner lacks standing to challenge any purported violation of the treaty.  (4) Whether respondent's use of petitioner's Panamanian bank records was improper because it violated Panamanian law or petitioner's Fourth Amendment rights. We hold it was not.  (5) Whether petitioner had unreported income for the years at issue as determined by respondent.  We hold he did.  (6) Whether petitioner is entitled to deductions for net operating losses for the years in issue.  We hold he is not.  (7) Whether petitioner is liable for additions to tax for fraud

---

[1]These consolidated cases essentially relate to unreported income from narcotics trafficking and unreported interest earned on that income.  Docket No. 9376-88 relates to years when the funds were located in the Cayman Islands, docket No. 7127-92 relates to years when the funds were located in Panama, and docket No. 13113-96 relates to years when the funds were in the custody of the District Court for the Southern District of Florida before being transferred to the Internal Revenue Service (IRS).

pursuant to section 6653(b) for the years 1978 through 1983 and 1985 through 1988, and the fraud penalty pursuant to section 6663 for 1989.[2]  We hold he is.  (8) Whether petitioner is liable for additions to tax for underpayment of individual estimated tax pursuant to section 6654 for the years 1978 through 1983 and 1987 through 1989.  We hold we lack jurisdiction for the years 1978 through 1983; however, he is for the years 1987 through 1989. (9) Whether petitioner is liable for additions to tax for substantial understatement pursuant to section 6661 for the years 1982, 1983, 1985, and 1986.  We hold he is.  (10) Whether petitioner is liable for an addition to tax for failure to file a timely return pursuant to section 6651(a)(1) for 1992.  We hold he is.

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated herein by this reference.  Petitioner resided in Florida at the time he filed the petitions in these consolidated cases.

---

[2]Petitioner did not file a return for 1989.  Accordingly, the fraud penalty should be under sec. 6651(f) for fraudulent failure to file, not under sec. 6663.  The latter section applies only where a return is filed.  See sec. 6664(b).  This is an error in form only and does not have a substantive effect on these cases.  Cf. Pietz v. Commissioner, 59 T.C. 207, 213-214 (1972).

- 5 -

FINDINGS OF FACT

Petitioner's Background

Petitioner has an extensive background in all aspects of
aviation.  Petitioner has worked loading airplanes.  He also has
a degree in aeronautic engineering and has served in the U.S. Air
Force.  In addition, petitioner has all obtainable pilot's
licenses and aircraft mechanic's licenses, including commercial
pilot.

Since the late 1960's, petitioner has been engaged in the
buying, selling, trading, and leasing of aircraft.  Between 1969
and 1976, petitioner engaged in these aircraft activities
primarily outside the United States.  In addition to conducting
these activities, petitioner was also flying as a commercial
pilot.  During this time, petitioner lived in various countries.

In approximately 1976, petitioner returned to the United
States to live and purchased a house at 19824 Bob O Link Drive in
Hialeah, Florida.  Petitioner had a large floor safe installed in
his house, into which he placed the cash that he had accumulated
from his previous business dealings, along with the money that he
was generating from his current business dealings.

Also in approximately 1976, in addition to his legitimate
aircraft business transactions, petitioner began leasing aircraft
to "bandits".  Bandits are persons engaged in the smuggling of
marijuana.  Petitioner placed the money he earned from these

activities into his floor safe along with his other funds, essentially all of which he converted into cash.

In 1978, petitioner pled guilty to conspiracy to possess 100 pounds of marijuana, relating to a transaction in which he leased an airplane to persons smuggling marijuana.

Petitioner did not file Federal income tax returns for years prior to 1977.

Cayman Islands Bank Account

By December 1977, petitioner had accumulated approximately $2.5 million in cash, which was stored in the floor safe in his house.  At this time, petitioner decided to relocate his cash from the floor safe in his house to a bank account in the Cayman Islands.

On February 27, 1978, petitioner opened a personal bank account at the Bank of Nova Scotia in the Cayman Islands, making an initial cash deposit of $247,500.  The Bank of Nova Scotia charged petitioner 1 percent of the deposit because it was cash. From February 27 until July 4, 1978, petitioner deposited a total of approximately $2 million in cash from his floor safe into his Cayman Islands account.  Thus, petitioner retained approximately $500,000 in cash in the floor safe to use for business and personal expenses.

Approximately one-half of this money that was deposited in the Cayman Islands account was from activities related to leasing aircraft to persons engaged in the smuggling of marijuana.

The funds petitioner deposited into the Bank of Nova Scotia were used to purchase interest-bearing certificates of deposit. During 1978, 1979, 1980, 1981, 1982, and 1983, these certificates of deposit earned interest in the amounts of $90,891, $294,835, $403,607, $588,847, $401,337, and $160,502, respectively.

Petitioner intentionally omitted the interest earned on his money on deposit in the Cayman Islands account from his 1978 through 1983 Federal income tax returns.

Cayman Islands Corporations

Cayman Aviation Finance was a Cayman Islands corporation that petitioner used to buy and trade airplanes. Cayman Aviation Finance owned a Mercedes Benz that petitioner drove and a condominium in North Carolina. Petitioner also had $486,000 in an account at the Bank of Nova Scotia titled in the name of Cayman Aviation Finance which he considered his money.

Kompas Corp. was another Cayman Islands corporation used by petitioner. Kompas Corp. owned a house located at 3060 N.E. 40th Street in Fort Lauderdale, Florida. Petitioner acquired this house in 1981 or 1982. Petitioner purchased the stock of Kompas Corp. and left the title to the house in the corporation's name.

Real Estate, Boats, and Airplanes

Petitioner owned various parcels of real estate and several boats and airplanes.

In July 1978, petitioner purchased a DC-6 airplane, No. 45501, for $250,000. He also expended $50,000 for repairs to this airplane in 1978.

In 1981, petitioner purchased a Douglas DC7C airplane, No. 74303, for $112,000. Also, on January 16, 1981, petitioner purchased a Piper Aztec airplane for $18,720.

In August 1982, petitioner purchased a 1982 Lear airplane, No. 97MJ, for $150,000. On December 30, 1982, petitioner also made a cash downpayment of $5,000 on the purchase of a Lear 24 airplane, No. N100VQ. In addition, petitioner purchased a Cessna 305, L-19 airplane, No. N5229G, for $31,800 in 1982.

In 1980, petitioner purchased a 28-foot cigarette boat for $4,106. Also in 1980, petitioner expended $26,000 for repairs to a 35-foot cigarette boat, which was sold for $48,000.

On October 31, 1978, petitioner purchased certain real property located in Miriah, North Carolina, for $47,000.

In 1979, petitioner purchased a house at 1357 Seminole Drive in Fort Lauderdale, Florida, for $468,000. This house was titled in the name Intercontinental Aircraft Leasing. Petitioner moved into the house at 1357 Seminole Drive in late 1980 after his

house at 19824 Bob O Link Drive was machine gunned by drug dealers.

The only other asset Intercontinental Aircraft Leasing owned was another house located at 1261 Seminole Drive, Fort Lauderdale, Florida, which was purchased in 1982. On February 15, 1982, petitioner paid $53,170.41, the balance due on the purchase of the house located at 1261 Seminole Drive.

Petitioner's Arrest in Mobile, Alabama

On June 13, 1980, petitioner was arrested by Federal authorities in Mobile, Alabama, and charged with possession of or conspiracy to possess a controlled substance. The arrest stemmed from a transaction where petitioner was delivering 105,000 methaqualone tablets, or quaaludes, to Mobile in exchange for approximately $175,000 in cash.

On June 17, 1980, petitioner hired Thomas Haas (Haas), an attorney in Mobile, to represent him. Haas concluded that there was no defense, either directly or indirectly, to the charge and that he had no way of winning the case on trial.

At that time William Kimbrough (Kimbrough) was the U.S. attorney for the Southern District of Alabama. The chief assistant U.S. attorney was William Rudolph Farve (Farve).

Haas plea bargained with Farve. The U.S. attorney in Mobile entered into a plea agreement with petitioner, which was not reduced to writing, whereby petitioner agreed to provide the

Government with evidence, testimony, and cooperation in connection with an investigation in the Southern District of Florida. See <u>United States v. Harvey</u>, 869 F.2d 1439 (11th Cir. 1989) (en banc). Michael Patrick Sullivan (Sullivan), an assistant U.S. attorney for the Southern District of Florida, participated in creating the agreement. In exchange for his cooperation, petitioner would have the charges against him in Mobile dismissed. When the U.S. attorney in Mobile received information that petitioner had satisfied his obligations under the plea agreement, Kimbrough filed a motion to dismiss the case that was then pending against petitioner in the Southern District of Alabama. The charges against petitioner in Mobile were ultimately dismissed on March 16, 1981.

<u>Petitioner's Criminal Tax Investigation in Florida</u>

In 1983, the Criminal Investigation Division (CID) of the IRS was investigating petitioner. The CID investigation of petitioner resulted in a Federal grand jury investigation of petitioner in the Southern District of Florida.

As part of the grand jury investigation, CID Special Agent Stanley R. Young III (Young) was designated agent of the grand jury for purposes of receiving, analyzing, and maintaining documents sought by the grand jury as part of its investigation. In June 1983, grand jury subpoenas were served on petitioner by Young seeking petitioner's personal records and his corporate

records, including those from the Cayman Islands.  Petitioner did not produce any of the records.

In addition, a grand jury subpoena was served on the Bank of Nova Scotia for the records relating to petitioner's bank account in the Cayman Islands.  Petitioner's Cayman Islands bank records were not produced pursuant to this subpoena.

On July 28, 1983, petitioner removed all his funds at the Bank of Nova Scotia in the Cayman Islands.  Petitioner withdrew $3,125,000 from his personal accounts and $486,000 from the account of Cayman Aviation Finance, which petitioner considered his money.

The funds petitioner withdrew from the Bank of Nova Scotia were eventually deposited into petitioner's accounts at the Bank of Credit and Commerce International (BCCI) in Panama City, Panama.  Petitioner's accounts at BCCI were interest-bearing accounts.  During 1985, 1986, 1987, 1988, and 1989, petitioner earned interest on his funds deposited at BCCI in the amounts of $271,383, $265,288, $214,074, $277,315, and $354,072, respectively.  Petitioner intentionally omitted the interest earned on his money on deposit in Panama at BCCI from his 1985 through 1988 Federal income tax returns.  Petitioner did not report any of the interest he earned on the funds deposited at BCCI during any taxable year.

The Government did eventually obtain petitioner's Cayman Islands records, but not through grand jury subpoenas. The records were obtained from the Cayman Islands Government pursuant to the Agreement Concerning Obtaining Evidence From Cayman Islands With Regard to Narcotics Activities, Aug. 29, 1984, U.S.-U.K., 24 I.L.M. 1110 (as extended). The records were received by Stephen Snyder (Snyder), an attorney in the Tax Division of the Department of Justice. Snyder's office was located in Washington, D.C.; however, some of the responsibilities of his position entailed investigations in the Southern District of Florida.

Immediately after Snyder received the records, he called Young and had him fly to Washington, D.C., to pick them up. Young, as agent of the grand jury, accepted the records on behalf of the grand jury in the Southern District of Florida. Young brought the records back to Florida with him and kept them in a locked security cabinet in his office in Fort Lauderdale. Thereafter, Young physically presented the records to the grand jury with a discussion and analysis.

Using in part the Cayman Islands records, the grand jury in the Southern District of Florida indicted petitioner in 1985 for criminal tax violations for the years 1978 through 1982. Petitioner filed a motion to dismiss the indictment as a

violation of the plea/cooperation agreement which was agreed to in Mobile, Alabama.

During the litigation of petitioner's criminal tax charges in Florida, the District Court for the Southern District of Florida held that petitioner was given both use and transactional immunity in his 1980 informal, unwritten, agreement with the Government, and the indictment charging criminal tax violations was dismissed.  See United States v. Harvey, 651 F. Supp. 894 (S.D. Fla. 1986).  A divided panel of the Court of Appeals for the Eleventh Circuit affirmed.  See United States v. Harvey, 848 F.2d 1547 (11th Cir. 1988).  Subsequently, the Court of Appeals decided to rehear the case en banc and vacated the panel opinion. See United States v. Harvey, 855 F.2d 1492 (11th Cir. 1988).  The Court of Appeals then held that even though petitioner was given use and transactional immunity in September 1980, the immunity grant did not prohibit prosecution for criminal tax violations allegedly committed in the years following the grant of immunity. See United States v. Harvey, 869 F.2d 1439 (11th Cir. 1989) (en banc).  Petitioner was convicted of violating section 7201 for his 1981 taxable year.

Petitioner's Arrest in St. Louis, Missouri

On December 18, 1986, petitioner was arrested at an airport in St. Louis, Missouri, by the CID of the IRS.  The arrest was pursuant to a December 8, 1986, indictment by a Federal grand

jury in St. Louis, related to aircraft transactions with drug smugglers. Petitioner's arrest in St. Louis was unrelated to the grand jury and criminal tax prosecution in the Southern District of Florida.

Following reversal of his initial conviction and remand, 845 F.2d 760 (8th Cir. 1988), petitioner was convicted in the Eastern District of Missouri of conspiracy to impede the IRS in collection of income taxes in violation of 18 U.S.C. sec. 371. See United States v. Harvey, 900 F.2d 1253 (8th Cir. 1990).

At the time of his arrest, petitioner had $29,800 of U.S. currency in his possession, along with three cashier's checks totaling $250,000. The checks were payable to Jerry L. Harvey, and the purchaser of the checks was Bill Walker & Associates.

Shortly after petitioner's arrest in St. Louis, IRS Revenue Agent Ken Kibort (Kibort) was assigned to investigate petitioner's potential civil tax liabilities. Kibort received the assignment from his group manager and was handed a newspaper article about petitioner's arrest. Kibort's assignment was to investigate a potential termination assessment against petitioner. From the currency and checks in petitioner's possession at the time of his arrest, it appeared to Kibort that petitioner had sold an airplane to Bill Walker & Associates.

A bond detention hearing in connection with petitioner's St. Louis arrest was held on December 23, 1986. The bond detention

hearing was open to the general public. Kibort attended petitioner's bond detention hearing and obtained a copy of a proffer that was submitted in evidence at the hearing. The proffer was submitted by the Government in support of a motion for detention and explained why petitioner was perceived as a flight risk. Kibort relied on the information obtained at the bond detention hearing and contained in the proffer as background information for petitioner's termination assessment.

The proffer disclosed that petitioner had been indicted in Fort Lauderdale for income tax evasion pursuant to section 7201 for the years 1978 through 1982 and for filing a false return for 1980 pursuant to section 7206(1). The indictment for the latter offense was based on his having indicated on the 1980 return that he did not have an interest in or authority over a foreign bank account during the tax year. The proffer also indicated that part of the underreported income for the years of the indictment was $1.8 million of interest income from Cayman Islands accounts. In addition, the proffer indicated that during the pendency of his criminal tax case in Florida, petitioner removed $485,000 from his Cayman Aviation Finance account and $3,125,000 from six certificates of deposit at the Bank of Nova Scotia in the Cayman Islands.

The proffer also chronicled petitioner's past experiences with law enforcement officials. In addition, the proffer

indicated that petitioner was an adept pilot, had experience with international travel, possessed high-quality counterfeit identification, and held property in corporate names.

Kibort found this information he obtained at the bond hearing very significant in making a termination assessment. Kibort's inquiry into petitioner's civil tax liability did not end, however, with the information obtained from the proffer at the bond hearing. Kibort contacted Bill Walker & Associates, which was a brokerage firm on St. Simons Island, Georgia. Kibort learned that Bill Walker & Associates paid petitioner the three checks in his possession at the time of his arrest, in addition to two other checks and some currency.

Kibort also contacted an individual named Rafael Ellis (Ellis) in Oklahoma City, Oklahoma. Ellis represented a Brazilian corporation that purchased the aircraft at issue. Ellis told Kibort that petitioner wanted the purchase price in currency. Ellis did not want to pay the purchase price in currency, so petitioner gave him the option of wire transferring the purchase price to petitioner's bank account, No. ML-49, at BCCI in Panama. Petitioner also told Ellis that his banker was an individual named Syed Aftab Hussain (Hussain).

Since Kibort now knew the sale price of the aircraft from the checks and currency, his next goal was to determine petitioner's basis in the aircraft. Kibort discovered the

aircraft at issue had been purchased in Oklahoma along with two other aircraft.  The purchase records indicated that there was a wire transfer of $750,000 from BCCI in Panama, in addition to $300,000 in currency.  At the time of the termination assessment, however, Kibort did not know about the $750,000 wire transfer from Panama.  Kibort knew only that three aircraft had been purchased, and he allocated a purchase price to the aircraft at issue for purposes of the termination assessment.  Based on the sale price and basis, there was a profit on the aircraft at issue.

On December 31, 1986, the IRS made three termination assessments:  One against Intercontinental Jet, Inc. (Intercontinental Jet), another against petitioner personally, and a third against petitioner as a transferee of Intercontinental Jet.

Petitioner challenged the termination assessments, and Kibort continued to work on the case.  Petitioner went through the administrative level of appeals of the termination assessments and then petitioned the District Court for the Southern District of Florida regarding the assessments.  An open hearing regarding the termination assessments was held in West Palm Beach, Florida, before the same judge that had heard petitioner's criminal tax prosecution.

In order to prepare for the hearing in Florida, Kibort continued to follow up on several leads. At petitioner's bond hearing, Kibort learned from Young's testimony that petitioner had transferred money to Panama. Kibort also learned that a $65,000 check payable to petitioner from Ellis was negotiated at BCCI in Panama. Furthermore, Kibort learned that when petitioner was arrested in St. Louis, he had in his possession a business card of his banker, Hussain, who was an employee of BCCI, and an address book that showed the account No. ML-49 on one of the pages. Kibort also discovered, through FAA records, that petitioner had sold another aircraft in 1985 for $700,000, and $670,000 of that was wired to BCCI in Panama to account No. ML-49.

All this information Kibort was gathering was solely in preparation for the hearing regarding the termination assessments. Kibort was not working on anything related to petitioner's criminal tax prosecution. The District Court upheld the termination assessments in October 1987.

After the decision on the termination assessments was received, Kibort considered initiating a jeopardy assessment that would cover the taxable years for which petitioner was under criminal tax investigation. In order to do the jeopardy assessment, Kibort needed the approval of several high officials in the IRS, including someone representing the Collection

Division.  The Collection Division would want assurance that the assessment would result in a high probability of collection.

Kibort went to the IRS District Counsel in St. Louis and discussed with him whether the IRS could reach petitioner's money in Panama through a domestic branch of BCCI.  The St. Louis District Counsel referred Kibort to Jim Springer (Springer) at the Department of Justice.  Springer had just finished a similar case, where overseas funds were sought from an international bank through a domestic branch.  Springer advised Kibort that he would send him information regarding that action.

Springer was also familiar with petitioner.  While petitioner's criminal tax prosecution in Florida was pending, petitioner filed a motion opposing admission in evidence of foreign records, specifically records regarding petitioner obtained from the Government of the Cayman Islands.  The Government opposed petitioner's motion.  Attached to the Government brief in opposition was a list of 46 paid bank drafts from petitioner's bank accounts at the Bank of Nova Scotia in the Cayman Islands.  The final bank draft was paid on July 28, 1983, to the Canadian Imperial Bank of Commerce in the amount of $3,125,000.  Also attached to the brief was a July 25, 1983, letter to the manager of the Bank of Nova Scotia, signed by petitioner, that stated:

Please forward to Bruce Campbell & Co. a draft in favour of Canadian Imperial Bank of Commerce for the sum of US$3,125,000.00, the balance on the account should be handed to the bearer of this letter in cash. These sums represent the six Certificates of Deposit held at your branch and which mature today.

Bruce Campbell & Co. was the law firm petitioner used in the Cayman Islands. In addition, attached to the brief was a copy of the referenced check payable to the Canadian Imperial Bank of Commerce. Springer had a copy of this brief and sent it to Kibort in October 1987.

To make the jeopardy assessment, Kibort also needed to obtain the permission of the CID. Kibort needed permission from the CID to ensure that he was not taking any action that would harm the pending criminal case. Kibort flew to Florida to meet with Young, Revenue Agent Charlie Parenteau (Parenteau), and others. The meeting entailed solely a presentation by Kibort as to what he proposed to do as a computation to determine a liability. Young, Parenteau, and the others present at the meeting did not provide Kibort with any information. The CID approved the jeopardy assessment. On December 10, 1987, the assessment was made and levies were served against BCCI branches in Miami and New York.

Kibort computed the tax for the jeopardy assessment using, in part, the expenditures method based on the list of the 46 paid bank drafts attached to the brief he received from Springer.

Kibort also relied on Young's testimony at the bond hearing in St. Louis and the proffer. In addition, Kibort relied on a brief filed in the Court of Appeals for the Eleventh Circuit which dealt with the dismissal of petitioner's criminal tax indictment. All the information Kibort used to make the jeopardy assessment was public record.

The jeopardy assessment, like the termination assessment, was litigated. It proceeded through an administrative level of appeals and was then petitioned to the District Court for the Southern District of Florida. The District Court held that the jeopardy assessment was reasonable. See Harvey v. United States, 730 F. Supp. 1097 (S.D. Fla. 1990).

Kibort was also involved in issuing the notice of deficiency for the years 1978 through 1983. The principal difference of this calculation from the calculation for the jeopardy assessment was that certain expenditures were added to unreported income that were either unexplained or cash. None of the information Kibort used came from Young, Snyder, or Parenteau unless it was public record.

BCCI Returns Petitioner's Funds to the United States

BCCI deposited $4,602,776.17 of petitioner's money into the registry of the District Court for the Southern District of Florida in April 1990. To find out whether this represented all

of petitioner's funds in Panama, Kibort and others requested petitioner's bank records from BCCI.

Special Agent Pamela L. McCullough (McCullough) of the U.S. Customs Service had been participating in criminal investigations concerning Manuel Antonio Noriega (Noriega) of Panama, and others, in narcotics trafficking and money laundering. These investigations led to two indictments against Noriega, and others, including BCCI, in the District Court for the Middle District of Florida in Tampa. Following the investigations, as part of a plea agreement, BCCI agreed to assist the Government in obtaining banking records maintained in Panama.

In approximately April 1990, McCullough went to Panama and presented the Panamanian Government with an affidavit to obtain the records of Noriega and others, including petitioner. McCullough included the request for petitioner's records at the request of an IRS CID agent. Petitioner's records were obtained from BCCI and were used to make the determinations in the notice of deficiency issued to him for the years 1985 through 1989.

The $4,602,776.17 returned by BCCI was deposited by the Clerk of the Court for the Southern District of Florida into an interest-bearing account at NationsBank. In June 1992, the IRS received, pursuant to an order of the District Court, a total of $5,132,074.88 from the NationsBank account consisting of the $4,602,776.17 originally received from BCCI together with accrued

interest in the amount of $529,298.71. The $5,132,074.88 received by the IRS during 1992 was applied to petitioner's unpaid tax assessments.

Petitioner was sent a form "Combined 1099/1098 Tax Statement" by NationsBank. It was addressed "Jerry Lee Harvey, 5231 N.W. 84th Avenue, Fort Lauderdale, FL 33351-4903." This form states that petitioner earned interest in the amount of $529,298.71 during 1992. Petitioner did not report this income.

OPINION

Issue 1. Petitioner's 1980 Plea Agreement

Petitioner asserts that his 1980 plea agreement in Mobile, Alabama, bars the Government from collecting any taxes on the Cayman Islands funds he had accumulated before the agreement. Petitioner's argument is that his 1980 agreement gave him prospective civil tax immunity from the interest earned on the fruits of his drug-trafficking career. Petitioner has advanced this argument unsuccessfully in the past.

To summarize, petitioner accumulated substantial amounts of money as a drug trafficker. He deposited this money in clandestine accounts in the Cayman Islands, where it earned a considerable amount of interest. Petitioner intentionally did not report this interest income on any Federal income tax return. When petitioner was arrested in Mobile, Alabama, he entered into a plea agreement in which he cooperated with the Government.

Pursuant to this agreement, petitioner told Federal authorities about his financial dealings, including the existence of funds in the Cayman Islands.

Petitioner's 1980 plea agreement has already been the subject of extensive litigation.  In finding the jeopardy assessments for 1978 through 1983 against petitioner reasonable, and the amount assessed appropriate under the circumstances, the District Court for the Southern District of Florida held:

> This Court does not accept * * * [petitioner's] contentions that his 1980 grant of immunity estops the Government from making jeopardy assessments for civil tax liabilities against the taxpayer.  For ease of analysis, the assessments can be divided between pre-immunity and post-immunity tax years.  The Eleventh Circuit has determined that the 1980 grant of immunity does not encompass tax years subsequent to 1979 and that * * * [petitioner] is not immune from criminal prosecution for tax evasion for post-immunity tax years.  Harvey, 869 F.2d at 1449.  In light of the fact that the immunity agreement does not even extend to tax years after 1979, there is no question that the grant of immunity does not preclude the Service from making assessments for the tax years 1980 through 1983.  As for 1978 and 1979, the trial judge in United States v. Harvey, 651 F. Supp. 894 (S.D. Fla. 1986), rev'd 869 F.2d 1439 (11th Cir. 1989) originally held that there was immunity from criminal prosecution for tax evasion for these years, but has subsequently determined that, at least for purposes of a termination assessment, the grant of immunity did not include civil matters.  Harvey v. United States, Case No. 87-6193 (S.D. Fla. September 24, 1987).  Given the limited effect of judicial review of a jeopardy assessment pursuant to section 7429, this Court will adopt this well-reasoned approach.  For purposes of this jeopardy review, the 1980 grant of immunity does not preclude the Government from making assessments for civil tax liabilities for the years 1978 and 1979. [Harvey v. United States, 730 F. Supp. at 1104-1105.]

Petitioner relies on a footnote in the en banc opinion of the Court of Appeals for the Eleventh Circuit for the proposition that his 1980 plea agreement bars respondent from pursuing any taxes he failed to pay on his Cayman Islands funds before September 1980. In the en banc review of his criminal tax indictment in Florida, the Court of Appeals stated:

> the government at least implicitly has come to recognize that the 1980 immunity agreement bars any prosecution for tax evasion allegedly committed before September of 1980 (the date of the immunity agreement), or any other legal action, such as forfeiture, that might arise from violations that allegedly took place before the immunity agreement. Harvey got a fresh start in 1980, including his Cayman Islands money. [United States v. Harvey, 869 F.2d at 1443 n.6.]

Petitioner argues that this footnote from the opinion of the Court of Appeals in his criminal tax case prevents respondent from pursuing any taxes he failed to pay on his Cayman Islands funds before September 1980, the date of the immunity agreement. Petitioner further argues that the full extent of his 1980 agreement, especially as it relates to civil tax liabilities after September 1980, needs to be addressed in these proceedings.

Petitioner's 1980 agreement does not encompass tax years after 1979. See United States v. Harvey, 869 F.2d at 1449; Harvey v. United States, 730 F. Supp. at 1104. Accordingly, respondent is not precluded from pursuing taxes for the years after 1979 by petitioner's 1980 agreement.

Furthermore, respondent is not precluded from pursuing taxes for the years 1978 and 1979 by petitioner's 1980 agreement. The judge who originally dismissed petitioner's criminal tax indictment in the Southern District of Florida also subsequently held that for purposes of the termination assessment, petitioner's 1980 agreement did not include immunity from civil taxes. See Harvey v. United States, 730 F. Supp. at 1105. A second judge for the Southern District of Florida also held that petitioner's 1980 agreement did not include civil tax immunity for 1978 and 1979 for purposes of the jeopardy assessments. See id. When the District Court reviewed petitioner's jeopardy assessments, it had the benefit of weighing the en banc opinion of the Court of Appeals for the Eleventh Circuit in its determinations. The District Court did not hold that the footnote, on which petitioner now relies, prevented respondent from pursuing taxes for 1978 and 1979.

In addition, the then U.S. attorney for the Southern District of Alabama, Kimbrough, testified at trial that he did not have the authority to compromise petitioner's civil liability for Federal taxes and did not discuss any immunity from such taxes with petitioner or his attorney, Haas. Kimbrough testified that in making the immunity agreement, petitioner's obligation to pay taxes was not something that he considered. Sullivan, the assistant U.S. attorney for the Southern District of Florida who

participated in creating petitioner's 1980 agreement, likewise testified that he did not have the authority to compromise or grant immunity from Federal taxes. Accordingly, petitioner's 1980 agreement does not prevent respondent from determining deficiencies in petitioner's income taxes for 1978 and 1979.

Issue 2. Grand Jury Secrecy and Fed. R. Crim. P. 6(e)

Petitioner asserts that respondent improperly used grand jury information in violation of rule 6(e) of the Federal Rules of Criminal Procedure. Petitioner asserts that this information formed the direct basis for the jeopardy assessments and notice of deficiency for the taxable years 1978 through 1983 and indirectly led to the notices of deficiency involving the taxable years 1985 through 1989, and 1992.

During the criminal tax proceedings in the Southern District of Florida, petitioner's Cayman Islands records were obtained and presented to the Federal grand jury. Petitioner asserts that information regarding his Cayman Islands accounts was improperly disclosed and then used by respondent.

Generally, matters occurring before a Federal grand jury may not be disclosed. See Fed. R. Crim. P. 6(e). Petitioner contends that respondent's determinations are based on information that was improperly obtained in violation of rule 6(e) of the Federal Rules of Criminal Procedure.

Petitioner has made this argument before.  In upholding the jeopardy assessments, the District Court for the Southern District of Florida stated:

> This Court finds no merit in * * * [petitioner's] contentions that the jeopardy assessments should be barred because the Internal Revenue Service relied on grand jury information purportedly disclosed in violation of Rule 6(e) of the Federal Rules of Criminal Procedure.  The Federal Rules of Criminal Procedure provide for disclosure of grand jury information to a Government attorney conducting criminal matters. Fed.R.Crim.P. (6)(e)(3)(A)(i), 54(c).  It is axiomatic that this "grand jury information" is properly revealed during a criminal proceeding.
>
> Furthermore, Rule 6(e) does not restrict the use of grand jury information which has been publicly disclosed in open court.  * * *  The "grand jury information" relied upon in making the jeopardy assessment in this case was disclosed in the bond detention hearing, at the pre-Kastigar hearing and in various other aspects of criminal proceedings.  There is no evidence that these disclosures were improper. Furthermore, the majority of the information relied upon in making the assessments has been incorporated in a published decision.  * * *  [Harvey v. United States, 730 F. Supp. at 1107-1108.]

We agree with the conclusions of the District Court for the Southern District of Florida.  Kibort's primary source of information for the determinations was the proffer and testimony from the bond detention hearing in St. Louis, as well as a brief filed in petitioner's criminal case in Florida.  All of this information was part of the public record.  The fact that petitioner failed to object to the disclosure of this information at the bond detention hearing, or various other proceedings

before the District Courts, vitiates his belated objection now.

See <u>Gavosto v. Commissioner</u>, T.C. Memo. 1994-481.  We hold that

there was no improper disclosure or use of grand jury information

by respondent.[3]

<u>Issue 3.  Cayman Islands Treaty Violation</u>

Petitioner asserts that respondent improperly used

information that was obtained from the Government of the Cayman

Islands in violation of an agreement between the United States

and the United Kingdom.

Evidence concerning petitioner's bank accounts in the Cayman

Islands was obtained pursuant to the Agreement Concerning

Obtaining Evidence From Cayman Islands With Regard to Narcotics

Activities, Aug. 29, 1984, U.S.-U.K., 24 I.L.M. 1110 (as

extended).  Petitioner challenges the use of this evidence by

asserting a violation of the agreement.

Petitioner's bank records in the Cayman Islands were

originally obtained for use in the criminal tax case in Florida.

In order to obtain these records under the terms of the

---

[3]We note that Fed. R. Crim. P. 6(e) orders were later
issued.  Hugh G. Isley, Jr. (Isley), was originally petitioner's
attorney in these proceedings.  When Isley began representing
petitioner, he had no information or records for petitioner and
was attempting to obtain any records he could.  In July 1994, the
District Courts for the Southern District of Florida and the
Eastern District of Missouri issued Fed. R. Crim. P. 6(e) orders
allowing the grand jury material gathered against petitioner to
be used by both petitioner and respondent in these cases.

agreement, the Attorney General of the United States was required to certify that the records were for use in the grand jury proceedings in Florida involving petitioner. Furthermore, the Attorney General had to certify that the records would not be used or disclosed for any purposes other than the resolution of matters encompassed by the agreement without the written consent of the Government of the Cayman Islands through the Cayman Attorney General.

Petitioner argues that neither the criminal tax prosecution in Missouri nor the instant civil tax proceedings are matters encompassed by the agreement; i.e., narcotics activities. Therefore, petitioner argues, the written consent of the Government of the Cayman Islands was required for disclosure of the records. Thus, petitioner asserts that since there was no written authorization, it was improper to use the records for any purpose other than the investigation conducted by the Federal grand jury in Florida.

The District Court for the Southern District of Florida has addressed this argument as well. In upholding the jeopardy assessment, the District Court stated:

> Neither are the jeopardy assessments prohibited on the grounds that they are based on documents which * * * [petitioner] asserts were obtained in violation of a treaty with the Cayman Islands. United States citizens do not have standing to challenge purported violations of this treaty because the agreement did not create any rights for United States citizens. United States v.

Mann, 829 F.2d 849, 852-853 (9th Cir. 1987).  * * *
[Petitioner], a United States citizen, has no standing
to challenge any purported violation of the Cayman
Islands treaty.  [Harvey v. United States, 730 F. Supp.
at 1106.]

See also United States v. Mann, 829 F.2d 849, 852-853 (9th Cir.

1987); United States v. Trupin, No. 97 Cr. 97 (S.D.N.Y. May 20,

1999).

We agree with the conclusions of the District Court for the

Southern District of Florida.  We hold that petitioner lacks

standing to challenge any purported violation of the Cayman

Islands treaty.

Issue 4.  Panamanian Law and Fourth Amendment Violations

Petitioner argues that his BCCI bank records were obtained

in violation of Panamanian law.  Therefore, petitioner argues,

respondent's use of the records in making the determinations is

prohibited.

Petitioner's records were obtained from BCCI pursuant to a

request by an agent of the U.S. Customs Service.  Petitioner

asserts that the request failed to meet the requirements for

production of the records under Panamanian law.  In broad

strokes, petitioner argues that the records can be produced only

when evidence of drug trafficking, and linkage between the

trafficking and specific funds in Panamanian banks, is shown.

Petitioner also states that this evidence must include the

statement of at least two investigators, sworn to in person in Panama. Petitioner asserts that the request did not satisfy these requirements.

Petitioner asserts that pursuant to Panamanian law, he has standing to challenge the manner in which the records were obtained. We disagree. The article of law under which petitioner claims to have standing refers to "all nationals and foreigners living under Panamanian jurisdiction", which does not include petitioner. Accordingly, petitioner lacks standing to challenge any purported violation of Panamanian law. Cf. United States v. Mann, supra at 852-853; Harvey v. United States, 730 F. Supp. at 1106. We hold respondent's use of petitioner's BCCI records was not improper.

Petitioner also argues that the Government violated his rights under the Fourth Amendment to the U.S. Constitution when it sought and obtained his BCCI records. Petitioner does not have a protected Fourth Amendment interest in his BCCI records. See United States v. Payner, 447 U.S. 727 (1980); United States v. Miller, 425 U.S. 435 (1976); see also United States v. Mann, supra. Thus, petitioner's claim of a Fourth Amendment violation fails.

Issue 5.  Petitioner's Unreported Income

Respondent determined that petitioner had unreported income from the sale of aircraft and narcotics trafficking, and unreported interest on that income.[4]

Respondent used the bank deposits method for the years 1978 through 1983 and then added certain additional cash or unexplained expenditures.  For the years 1985 through 1989, respondent determined that petitioner had unreported interest from BCCI in Panama and unreported gain in 1985 from the sale of a Lear jet.  For 1992, respondent determined that petitioner had unreported income from NationsBank.

Every taxpayer is required to maintain adequate records of taxable income.  See sec. 6001.  Petitioner did not maintain adequate records from which the amount of his income or Federal income tax liability could be computed.  In the absence of such records, a taxpayer's income may be reconstructed by any method that, in the Commissioner's opinion, clearly reflects income.  See sec. 446(b); Parks v. Commissioner, 94 T.C. 654, 658 (1990).  The Commissioner's method need not be exact but must be reasonable.  See Holland v. United States, 348 U.S. 121 (1954).

The bank deposits method for computing unreported income has long been sanctioned by the courts.  See DiLeo v. Commissioner,

---

[4]Respondent addresses only petitioner's unreported interest income on brief.

96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Though not conclusive, bank deposits are prima facie evidence of income. See Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977); see also Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964) (the bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes gross income); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Jones v. Commissioner, 29 T.C. 601 (1957). Where the taxpayer has failed to maintain adequate records as to the amount and source of his or her income, and the Commissioner has determined that the deposits are income, the taxpayer has the burden of showing that the determination is incorrect. See Rule 142(a); Clayton v. Commissioner, 102 T.C. 632, 645 (1994); Parks v. Commissioner, supra; Estate of Mason v. Commissioner, supra. Furthermore, the Court of Appeals for the Eleventh Circuit, to which these cases are appealable, has accepted the bank deposits method of income reconstruction. See United States v. Carter, 721 F.2d 1514, 1538 (11th Cir. 1984) (citing United States v. Boulet, 577 F.2d 1165 (5th Cir. 1978)).

Petitioner was engaged in illegal narcotics activities. In addition, the parties stipulated that in 1993 petitioner testified during his criminal trial in Florida as follows:

"Q: Did you report any of the money you earned in '78 and '79

A: Which money are you discussing

Q: Illegal money for smuggling dope

A: Absolutely not.

Q: So you evaded you [sic] taxes in '78 and '79

A: Yes, I did.

Q: You also earned interest income in '78 and '79 from the Bank of Nova Scotia

A: Yes.

Q: You didn't report that interest income either

A: No."

Petitioner does not challenge respondent's income reconstruction. Accordingly, respondent's determinations are sustained.

In addition, petitioner stipulated that he did not report interest income in the years at issue as follows:

| Year | Amount |
|------|--------|
| 1978 | $90,891 |
| 1979 | 294,835 |
| 1980 | 403,607 |
| 1981 | 588,847 |
| 1982 | 401,337 |
| 1983 | 160,502 |
| 1985 | 271,383 |
| 1986 | 265,288 |
| 1987 | 214,074 |
| 1988 | 277,315 |
| 1989 | 354,072 |

Petitioner asserts that during 1990 through 1992, the time his funds were held by the District Court for the Southern

District of Florida, he had no access to the funds or any of the interest earned during that time.

In Poczatek v. Commissioner, 71 T.C. 371, 376-377 (1978), the Court held that

> It is well settled that income is taxable when it has been actually or constructively received. North American Oil Consolidated Co. v. Burnet, 286 U.S. 417 (1932). * * * [I]t is equally well settled that income is not limited to direct receipt of cash (Crane v. Commissioner, 331 U.S. 1 (1947)), and payment of a legal obligation of a taxpayer is income to him even though such income is not actually received by him. Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929); Amos v. Commissioner, 47 T.C. 65 (1966); Tucker v. Commissioner, 69 T.C. 675 (1978).

Accordingly, the $529,298.71 of interest earned on petitioner's funds deposited with the District Court is taxable to petitioner in 1992 when it was received by the IRS and applied to his unpaid tax assessments.

Issue 6. Petitioner's Losses

Petitioner next contends that he suffered various business losses during the tax years in issue which he never claimed. These include funds which petitioner claims were stolen from his Panamanian bank accounts and losses on various aircraft and business investments. Thus, petitioner claims there were resulting net operating losses which reduce his tax liabilities.

Petitioner has the burden of proving both the right to and the amount of the net operating loss deductions pursuant to section 172. See Rule 142(a); Welch v. Helvering, 290 U.S. 111,

115 (1933). The taxpayer's burden of establishing his entitlement to a net operating loss deduction includes the burden of substantiation. See Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976). The Court is not bound to accept unverified, undocumented testimony of the taxpayer. See id.

At trial, the principal evidence presented in support of his claim was petitioner's own discursive testimony. Petitioner also submitted written narratives to chronicle his losses, along with photocopies of certain records.

We do not find petitioner to be a credible witness, and we give his testimony no weight. The photocopied records are not sufficient evidence from which the Court can determine the amount of and the right to deductions or losses for prior years. Petitioner has therefore failed to meet his burden of proof. Petitioner is not entitled to the asserted net operating losses for the years in issue.

Issue 7. Fraud

Respondent determined that petitioner is liable for the addition to tax for fraud under section 6653(b) for the years 1978 through 1983 and 1985 through 1988.[5] Respondent determined that petitioner is liable for the fraud penalty pursuant to

---

[5]Petitioner concedes that the addition to tax for fraud applies for 1981.

section 6663 for 1989. Petitioner asserts that he had a good faith belief that his 1980 plea agreement gave him immunity from civil taxes and thus precludes a finding of fraud.

Section 6653(b) as applicable to 1978 through 1981 imposes an addition to tax of 50 percent of the underpayment if any portion of the underpayment is due to fraud. For 1982, 1983, and 1985, section 6653(b)(1) imposes an addition to tax of 50 percent of the underpayment if any portion of the underpayment is due to fraud, and section 6653(b)(2) imposes an additional amount equal to 50 percent of the interest with respect to the portion of the underpayment attributable to fraud. For 1986 and 1987, section 6653(b)(1)(A) imposes an addition to tax of 75 percent of the portion of the underpayment attributable to fraud, and section 6653(b)(1)(B) imposes an additional amount equal to 50 percent of the interest with respect to such portion. For 1988, section 6653(b) imposes an addition to tax of 75 percent of the underpayment attributable to fraud. For 1989, the fraud penalty imposed under section 6663 is equal to 75 percent of the portion of the underpayment attributable to fraud.[6] For the years 1986 through 1989, if respondent proves that any portion of the underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, unless petitioner can

---

[6]See supra note 2.

establish by a preponderance of the evidence that a portion is not attributable to fraud. See secs. 6653(b)(2), 6663(b).

The Commissioner has the burden of proving fraud by clear and convincing evidence. See sec. 7454; Rule 142(b); Parks v. Commissioner, 94 T.C. at 660. First, the Commissioner must prove that there is an underpayment. See Parks v. Commissioner, supra. Second, the Commissioner must show that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection. See Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

Petitioner has stipulated that he failed to report significant amounts of interest income. In addition, he has failed to establish that these amounts are offset by unreported deductions. Therefore, we conclude that respondent has presented sufficient evidence that petitioner underpaid his taxes for the years in issue.

Next, respondent must prove by clear and convincing evidence that petitioner had fraudulent intent. See Parks v. Commissioner, supra at 664. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. See Edelson v. Commissioner, 829 F.2d 828, 833 (9th Cir. 1987), affg. T.C. Memo. 1986-223. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. See

DiLeo v. Commissioner, 96 T.C. at 874. Fraud is never presumed and must be established by independent evidence of fraudulent intent. See Edelson v. Commissioner, supra.

The Commissioner may prove fraud by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. See Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984). The courts have developed a number of objective indicators or "badges" of fraud, such as: (1) A pattern of substantial understatements of income, (2) inadequate books and records, (3) implausible or inconsistent explanations of behavior, (4) engaging in illegal activities, (5) failure to cooperate with tax authorities, (6) concealing assets, and (7) dealing in excessive amounts of cash. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37. We consider all the facts and circumstances of each case to decide whether fraudulent intent is present. See King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992); Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Upon examination of the entire record, we conclude that petitioner's underpayments of Federal income taxes for the years 1978 through 1983 and 1985 through 1989 are attributable to

fraud.  Furthermore, petitioner has not established that any portions of the underpayments are not attributable to fraud.

A pattern of consistent underreporting of income for several years, especially when accompanied by other circumstances showing intent to conceal, such as illegal narcotics trafficking, is strong evidence of fraud.  See Holland v. United States, 348 U.S. 121 (1954); Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Estate of Mazzoni v. Commissioner, supra; Anderson v. Commissioner, 250 F.2d 242, 250 (5th Cir. 1957), affg. on this issue and remanding T.C. Memo. 1956-178.  Petitioner consistently underreported his income.

Petitioner failed to keep adequate records, a badge of fraud.  See Bradford v. Commissioner, supra; Lollis v. Commissioner, 595 F.2d 1189, 1192 (9th Cir. 1979), affg. T.C. Memo. 1976-15.

Petitioner's testimony was not credible.  Petitioner's claim that he had a good faith belief that his 1980 plea agreement gave him prospective civil tax immunity is unpersuasive.  Petitioner was convicted of criminal tax evasion for 1981, a year that postdated his plea agreement.  It may be inferred that the jury found that his violation of the reporting requirements of the Code for that year was willful.  Cf. United States v. Harvey, 869 F.2d at 1449 n.15.

Petitioner's engaging in illegal drug activities is evidence that he intended to evade tax. See Bradford v. Commissioner, supra at 308; Patton v. Commissioner, supra.

Petitioner did not cooperate with respondent's examining agents. Instead, petitioner refused to provide any of his banking and corporate records and attempted to transfer his funds from the Cayman Islands to other secret accounts in Panama. A taxpayer's failure to cooperate with the Commissioner's examining agents is a badge of fraud. See Bradford v. Commissioner, supra.

Concealing assets is evidence of fraud. See id. Petitioner's home, automobile, and various other assets were held by corporations in order to conceal ownership.

Extensive dealing in large amounts of cash, as petitioner did, also constitutes evidence of fraud. See Estate of Mazzoni v. Commissioner, supra.

We conclude that the record contains clear and convincing evidence of petitioner's intent to conceal, mislead, or otherwise prevent the collection of taxes on the unreported income for the years in issue. We hold that the understatements of tax attributable to the unreported income were due to fraud. Accordingly, we sustain respondent's determination that

petitioner is liable for additions to tax, and a penalty for, fraud.[7]

Issue 8.  Addition to Tax Under Section 6654

Respondent determined an addition to tax under section 6654 for underpayment of individual estimated tax for the years 1978 through 1983 and 1987 through 1989.

Respondent stipulated that petitioner filed Federal income tax returns for the years 1978 through 1983.  Petitioner did not file Federal income tax returns for the years 1987 through 1989.

The Commissioner's determinations are presumptively correct, and the taxpayer bears the burden of proving otherwise.  See Rule 142(a); Welch v. Helvering, 290 U.S. at 115.  Petitioner did not address this issue and has therefore failed to meet his burden. Accordingly, we sustain the addition to tax under section 6654 for the years 1987 through 1989.  We do not sustain, however, the additions to tax pursuant to section 6654 for the years 1978 through 1983.  It was stipulated that petitioner filed Federal income tax returns for those years.  Therefore, we lack jurisdiction over the additions to tax pursuant to section 6654 for the years 1978 through 1983.  See sec. 6662(b)(2) (redesignated sec. 6665).

---

[7]On the basis of this holding, the period of limitations has not expired for any year in which it would otherwise be in issue.

Issue 9.  Addition to Tax Under Section 6661

Respondent determined an addition to tax under section 6661 for the years 1982, 1983, 1985, and 1986.

For returns due after December 31, 1982 (but before January 1, 1990), section 6661 provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement.  An understatement is "substantial" if it exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000.  The understatement is reduced to the extent that the taxpayer (1) has adequately disclosed his or her position, or (2) has substantial authority for the tax treatment of an item.  See sec. 6661; sec. 1.6661-6(a), Income Tax Regs.  Petitioner again bears the burden of showing that he is not subject to the addition to tax determined by respondent.  See Rule 142(a); Cochrane v. Commissioner, 107 T.C. 18, 29 (1996).

Petitioner has presented no evidence to show that respondent erroneously determined the addition to tax under section 6661. Accordingly, we hold that petitioner is liable for the addition to tax under section 6661 for 1982, 1983, 1985, and 1986.

Issue 10.  Addition to Tax Under Section 6651(a)(1)

Respondent determined an addition to tax under section 6651(a)(1) for failure to file a timely return for 1992.

Section 6651(a)(1) provides for an addition to tax for failure to file a timely return. The addition to tax is equal to 5 percent of the amount required to be shown as tax on the return, with an additional 5 percent for each additional month or fraction thereof during which the failure continues, not exceeding 25 percent in the aggregate.

A taxpayer may avoid the addition to tax by establishing that the failure to file a timely return was due to reasonable cause and not willful neglect. See Rule 142(a); <u>United States v. Boyle</u>, 469 U.S. 241, 245-246 (1985). Petitioner did not address this issue. Accordingly, we sustain respondent's determination of an addition to tax under section 6651(a)(1) for 1992.

To reflect the foregoing,

<u>Appropriate orders will</u>
<u>be issued, and decisions will</u>
<u>be entered under Rule 155</u>.